Sneed, J.,
delivered the opinion of the Court.
The record embodies six distinct causes, which were consolidated and heard together in the Chancery Court of Sumner county. The defendant Blakemore was appointed Clerk and Master of said Court on the 10th of September, 1855, for. the lawful term of six years, and resigned said office in December, 1860. The complainants seek severally to hold the defendant and the sureties on his official bonds liable for official default on his part, in failing to pay over to them certain moneys belonging to them which came into his hands as Clerk and Master, and as Commissioner of Sales, under the orders and decrees of said Court. The questions submitted are important, and some of them novel in the courts of the State.
*640 The defendant Blakemore, upon his appointment to said office, made and executed four several bonds as required by law, for the discharge of the various duties devolved upon him, and which under the law might be imposed upon him in that relation. The first of these bonds was in the penalty of $10,000, conditioned that said Blakemore should safely keep the records of the Court and truly and faithfully discharge the duties of said office. The second was in the penalty of $5,000, conditioned for the payment of all money arising from taxes on suits. The third bond was for $1,000, and was for the collection and payment of fines and forfeitures; and the fourth and last bond was in the penalty of $5,000, conditioned that the said Blakemore, Clerk and Master of the Chancery Court at Gallatin, for the county of Sumner, State of Tennessee, shall well and truly pay over and account for all moneys that shall or may come to his hands upon sales of property made by him under orders and decrees of said Chancery Court.
It is upon the first and fourth of these bonds that complainants seek to predicate the liability of defendants. The same persons became bound as sureties on each of these bonds, and among them were J. A. Blakemore, who is now dead, and whose estate is insolvent, and Jo. C. Guild. The first named was the father of W. H. Blakemore, the Clerk and Master. As the equities attaching to the several cases are somewhat different, they will be distinguished in this opinion as the Walsh case, the Lloyd case, the Terry case, the Wilson case, the Bailey case, and the *641 Thompson case. For, in any event, the liability of the sureties in each case must depend upon the peculiar relation of their principal to the fund alleged to have been lost by his default. It is not contended that the second and third bonds above enumerated have anything to do with, the questions at issue. Our inquiry will therefore only be as to the liability1-of the defendants under the equities disclosed upon the first and fourth bonds — the former to safely keep the records of the Court and truly and faithfully discharge the duties of the office, and the latter well and truly to pay over and account for all moneys that shall or may come into his hands upon sales of property made by him under orders and deorees of the Court.
The Act of 1794, ch. 1, sec. 2, is in the words following: “ There shall be a clerk to each of the Circuit Courts, of skill and probity, who shall each of them give bond with security, payable to the Governor and his successors in office, of $10,000 for the safe keeping of the records and the faithful discharge of the duties of his office, which said bond shall be lodged in the Secretary’s office, and may be put in suit on the assignment of the Governor by the party or parties injured in his or their own name, and shall not become void on the first recovery, or if judgment be given against the plaintiff, but may from time to time be put in suit by action of debt until the whole penalty be recovered.” Car. & Nich., 155. All official bonds were by a late act made payable to the State of Tennnessee. In 1849, by ch. 150, it was enacted that all clerks of the Circuit, Chancery, or *642 Supreme Courts, elected or appointed after the passage of this act, when appointed by the courts of which they are clerks respectively, to act as special commissioners to sell property under any decree of the courts of which they are clerks, or as receivers, shall, together with their sureties, be liable for the faithful discharge of their official duties under the bonds executed by them, under the Act of 1794, ch. 1, sec. 2, for all sums of money that may come into their hands by virtue of said appointment as special commissioners or receivers. The second section of this act provides that it shall be the duty of the Judges of the Circuit, Chancery, and Supreme Courts, at the first term of their respective courts after the passage of this act, to cause the clerks of the said courts to execute bonds with good security in such sums as the Judge or Judges of said courts may deem sufficient, conditioned for the faithful accounting for, and paying over, all such sums as may come into their hands as such special commissioners. The third section gives the court the power, whenever they deem it necessary, to require a larger bond, not exceeding double the amount of the supposed value of the property to be sold. On the 27th of February, 1852, the Legislature passed another act, entitled “An Act to require clerks of the different courts to give additional bonds.”
The first section provides that it shall be the duly of the different County and Circuit Court Clerks in this State at the June Term, 1852, of the several County Courts in this State, to enter into bond and sufficient surety in the sum of $10,000, or such larger *643 sum as the Court may direct, payable to the State of Tennessee, to be approved by said County Courts, as now directed by law in taking official bonds from clerks in this State, conditioned that they will faithfully account for and pay over as the law directs, all moneys that have or may hereafter come into their hands as commissioners, by virtue of any order or decree made by their said courts, to sell the real or personal property belonging to any femme eovert or minor, or to the estate of any deceased person. The second section requires the different Chancellors, at the first term of their courts held after the passage of the act, to take a similar bond in a like penalty and with like conditions from their Clerks and Masters. Acts 1852, ch. 164.
It is under these several acts that the bonds of. defendant were given, and that it is sought to hold him and his sureties liable. The theory of the complainants is, that their respective demands will fall within the conditions of one or the other or both of these bonds, and that when the penalty of the one is exhausted they may resort to the other; that the first section of the act of 1849, ch. 150¿ making the Clerk liable for moneys collected as Special Commissioner or receiver, on the bond for the faithful discharge of his official duties, is still in force, and not repealed by the act of 1852, ch. 164, above quoted.
The facts necessary to illustrate the equities of the parties are these: In the Walsh case the complainant was entitled to a legacy of $3,000 under the will of Page P. Parker, to be paid upon his *644 attaining his majority, and until that time the testator’s widow was entitled to the use of half the fund, and his brothers and. sisters to the use of the other half. The widow intermarried with C. J. Coke. The land and slaves were sold under the decree of the Chancery Court of Sumner, and after reserving said legacy of $3,000, the remainder of the fund was ordered to be distributed under said will. "While the proceedings for the sale and settlement of the estate of Parker were pending, this complainant by next friend filed a petition in said Court to secure said legacy of $3,000 upon his arriving at full age. The petition was heard on the 16th of September, 1858, when the Court made a decree ordering that in the event that Coke'and wife and the heirs of the testator shall prefer not to receive said fund, the same shall be paid over to the guardian of complainant, to be loaned out for his benefit. The Court also decreed that before paying the fund over under the decree to the parties entitled, should they elect to receive it, the Master will require of them a bond, each in the penalty of $3,000, conditioned that said fund will be paid over to the said complainant or his representatives at the time he or they shall be entitled thereto under said will, which bond the Master will require to be renewed from time to time as the safety of the fund may require. On the 10th of March, 1858, judgments were taken for such portions of the purchase money as remained unpaid. So the entire amount of the $3,000 was collected. The circumstances seem to show that the parties entitled un- *645 cler the will to the use of the funds during the minority of complainant elected not to receive it and execute said bonds. Ho bonds were executed by them. Though the deposition of the Clerk is taken, it fails to show that any such bonds were executed, or the money paid over as required by said decree. On the 4th of October, 1860, having previously used the money, he took the note of his father, with J. C. Guild as security, payable to himself as Clerk and Master, for $2,590, due twelve months after date, bearing interest from date, and for the use of the legatees of P. P. Parker. In his deposition, the Clerk in reference to said note says: “I would state that it was a note given under the following circumstances: According to the will of P. P. Parker, the minor R. J. Walsh was to receive upon his attaining his majority the sum of $25,000. There was no order from the Court to loan out this fund, which had been collected by me as Clerk and Master, and upon which default had occurred, and at the time said note was executed the matter was discussed by my father and Judge Guild, and understood between them that it should be presented to the Court, and that if accepted in lieu of indebtedness, the same would be of binding force and effect, and otherwise null and void. So far as I remember said note was never presented to nor accepted hy the Court.”
In this case the Chancellor below decreed for the ■complainant the amount of the note with interest against the Clerk and his securities, but gave no decree for the remainder of the fund of $3,000.
*646 The complainant claims a decree for the entire sum, with interest on the whole from the date of the decree ordering the fund to be loaned out.
In the Lloyd case these are the facts: In 1851 the Chancery Court of Sumner ordered the sale of a negro belonging to complainant. The negro was sold and James G. Webb became the purchaser at the price of $802.50, for which he executed his note with security, to the Clerk and Master. On the 6th of November, 1852, the Clerk reported that the note so given would fall due on the first of January, 1853, and that the complainant had no regular guardian. Thereupon the Court ordered the Clerk, after paying the costs of the proceeding and the attorney’s fee, to loan out the remainder of the fund arising from the sale of said slave so as to yield interest, and that he hold the fund at alt times subject to the order of the Court, or, should a guardian be appointed, subject to his order. In pursuance of this order the Clerk and Master collected a portion of the fund to pay costs, and loaned the remainder to the purchaser Webb, who executed his note with J. C. Guild as his security. The Clerk reported the condition of the fund to the. September Term, 1854, and that he held the note of" Webb and Guild for the sum of $759.40, due at one day. The Court ordered him to hold said note under previous orders. At the September Term, 1855, the Clerk and Master was ordered to have the note renewed and to collect the interest that had accumulated and pay the same to Mr. C. C. Lloyd towards the support and education of the minor Thomas Lloyd. *647 At this term of the Court the defendant W. H. Blake-more was appointed and qualified as Clerk and Master. There appears to have been no further order touching this fund until the September Term, 1858, when the Clerk and Master was ordered to report the amount of the fund and the allowances made out of it by himself or the former Clerk and Master. It is shown that the fund was collected by the Clerk Blakemore, but the date of collection does not appear. The Chancellor dismissed the complainant’s bill and he appeals.
The four other cases of Terry, "Wilson, Bailey, and Thompson, rest upon the facts following: The real and personal estate of William Read, deceased, was sold under the decree of the Chancery Court of Sumner, based upon the award of Chancellor Ridley, acting as arbitrator for the parties. The sale amounted to $-. This sale was made by the Clerk and Master, and the fund collected by the defendant Blakemore. The style of the case thus submitted to arbitration was F. Rogan et al. v. W. H. Read et al. The complainants, Cornelia Terry, Mary Hill, Clarissa Aston, and Lea Read, deceased, were children of William Read, and entitled to an interest in said fund. After Blakemore went out of office his successor made a report touching said fund, and the result was as follows: There was a balance in the hands of the Clerk Blakemore and due to Geo. W. Terry and wife, she being styled Mrs. Cornelia Huffy in said report, of the sum of $1,894.83; to Mrs. Hill a balance of $445.25; to Mrs. Aston a balance of *648 $665.03, and to Lea Read a balance of $1,735.58. Lea Read died and his interest is sought to be recovered in the suit of Wm. Bailey. A proper administration has been granted to reach said interest.
The object of the two suits of Terry and Bailey is to recover the above sum with interest.
In the case of Wilson and others it appears that the real estate of complainants’ father was sold under a decree of the Chancery Court and the funds came into the hands of Blakemore, who failed to pay the same over to complainants. There is a balance claimed to be due them but the account does not appear.
In the case of Thompson, he claims in his own right, and as guardian, about $500 balance on sale of real and' personal estate belonging to P. P. Parker, deceased. The fund was collected and a part paid over, — but it is claimed that some $500 balance remained in the hands of Blakemore, the Clerk, which he failed to account for. The bill is filed by Thompson to recover this sum. The Court dismissed these several bills as to the sureties at the cost, of the complainants.
It is not seriously controverted by defendants that the defendant Blakemore, the Clerk and Master, was a defaulter in the manner charged in the several bills, but the amount of the several sums due complainants is not agreed. But the main defense set up is, that if there be any liability upon defendants at all it arises under the bond of their principal in the sum of $5,000, conditioned that he will pay over and account *649 for all moneys that shall or may come to his hands upon sales of property made by him under the orders and decrees of tho Court. And as a bar to any recovery upon that bond, it is pleaded and proven that one of the sureties, Dr. Blakemore, after the alleged defalcation of complainants, had paid of his own means a sum of money larger than the penalty of said bond, to divers other parties to -whom it was due, and for which he and the other sureties had become responsible under said bond, by reason of the default of their principal. And this payment is relied on as a satisfaction of the full penalty of the bond and a discharge of the securities therefrom. On the other hand it is contended that this payment by Dr. Blake-more was officious and voluntary, and does not effect the obligation of the bond. The facts in connection with these payments are, that upon the discovery of the defalcations of the office, the secureties on his bond became alarmed, and were debating the propriety of obtaining their release as his bondsmen, — or to use the words of the witnesses, — “they were talking about giving him up.” This feeling was common to all of the securities, four or five in number, except Dr. Blakemore, the father of the delinquent Cleric. About this time also, many parties interested in the funds thus squandered by the Clerk were demanding payment, and threatening suit on the bond.
In this condition of affairs Dr. Blakemore, being then a man of fortune, proposed to his co-securities, that if they would not abandon his son he would assume the liabilities, and indemnify them, and save *650 them harmless. His co-securities agreed to remain bound, and tbe claimants still threatening legal proceedings on the bond, Dr. Blakemore took charge of the financial department of the office, and began at once to pay off its liabilities out of his own private means, all the funds of the office having been made way with by the Clerk. This was done, we take it, according to the proof,. for the double purpose of averting the threatened ruin of his son and to indemnify his co-securities. But it was done also in deference to the clamorous demands against the office by persons whose debts had been withheld by the Master. The complainants do not deny these payments, nor do they expressly dissent from the position assumed by the defendants, that they were made in satisfaction of demands against the office for moneys collected on sales of property under the orders of the Court.
They do insist,' however, that their demands are equally mentioned, and are still unpaid, and that the bond of defendants was made to the State for the benefit and security of all litigants in the Court, and that said bond as to them could not be discharged by voluntary payments to others of demands not ascertained in a legal way to be just claims against the office.
The case thus stated presents questions of difficulty, some of which have not before been in judgment here. It is a rule of law that a party makes payments at his peril, and will be held bound to know whether the payee is authorized to receive the money. The true test is said to be whether or not the payor *651 could successfully resist a suit instituted by the payee. 12 Ills., 424. Hence it is held that a surety is not permitted to discharge the debt of his principal until he is in default and can be legally called on for payment. 1 Gilm., 409. And that is defined to be a voluntary payment, where the demand could not have been enforced against the party alleged to be liable ■without giving him a day in court, and where there is no duress of person or property. Though such payment is made under protest it is in law a voluntary payment. Marietta v. Slocomb, 6 Ohio St. R., 471. And in an attempt of one co-surety to have contribution of another, or of the party so paying the debt of another to recover back the amount from the debtor, these considerations would become important. The rights of these parties must depend, however, upon other principles. It must not be understood, however, that a security is bound to wait until he is forced into a court, and sued, before he may pay the debt and have recourse on those who are liable with him. 9 Con., 154. He can not, it is true, recover, unless he was bound for the payment; for if he pay a debt he is not legally bound to pay, he cannot have contribution. 16 Mass., 40; 6 Ala., 780, But he need not wait to be sued, but as soon as ijjie debt is due he may pay it, and have his action for contribution. 13 Johns., 58; 3 New H., 270; 20 Maine, 332; 2 Denio., 62. And it is held that he may pay or compromise the debt before it is due, and as soon as it is due may sue for contribution. Craig v. Craig, 5 Rawle, 91, 98.
*652 The sense of the rule was well expressed by Lord Henman, when he said that “no man is entitled to inflame his account against another by incurring additional expense in an unrighteous resistance to an action which lie can not defend.” Short v. Halloway, 11 A. & E., 31. The question recurs then, what was the effect of these payments by Dr. Blakemore upon the liabilities of his co-sureties under the bond? The condition of their covenant had been broken. It will be observed that the bond was conditioned that the Clerk should well and truly pay over and account for all moneys that might come to his hands upon sales of property mad*, by him under the orders and decrees of the Court. This bond is in the penalty of $5,000 less than the minimum amount prescribed by the statute. The official bond as clerk is in the penalty of $10,000, and conditioned that he shall safely keep the records and truly and faithfully discharge the duties of his said office. It is alleged on behalf of complainants that the conditions of both bonds had been broken, and the breach of the first is conceded by the' defendants, who say that thej^ are no longer bound upon it, because the penalty thereof has been fully discharged. It is conceded that the obligations and duties of the offices of special commissioner of sales and clerk are different and distinct, though filled by the same person. Before the act of 1852, ch. 164, they were different and distinct offices. 3 Head, 678. It follows that a defalcation as clerk and master is not covered by the condition of the bond as commissioner. Under the latter bond of de *653 fendants the obligors were bound only for the proceeds of property sold by the clerk himself, under the orders and decrees of the Court. They are not bound upon this covenant for any moneys to which the Clerk and Master as custodian succeeded upon taking office, which accrued from sales made by his predecessor, or for any moneys which may have fallen into his hands in any other manner of trust or deposit under the orders of the Court. And here it had as well be said that in our opinion the act of 1849, c. 150,- which holds the clerk liable upon his bond of office for his duties as commissioner is repealed by the act of 1852, ch. 164, which requires a special bond as commissioner of sales. The first section of the act of 1849, oh. 150, presupposes that the clerk who accepts the appointment of special commissioner has only given a bond of office, and holds him liable under this bond for the performance of his duties as commissioner also. The second section however, provides that a special bond be required as special commissioner, and the very terms of the act show that this bond was intended as special and not general, as the penalty is left to the discretion of the Chancellor. The act of 1852, ch. 164, seems to have superadded the duties of commissioner to those of clerk, and requires a separate bond in a minimum penalty of $10,000, with power in the court to fix the penalty at such larger sum as the court may direct. The office is declared vacant if the clerk fail to give this bond. So it is plain that the office of commissioner, under the latter act, is a part of the office of clerk. It was in the discre *654 tion of the clerk under the first act to accept or decline the appointment of commissioner; but, under the last he has no discretion, but must lose his office as clerk if he declines that of commissioner. The imperative superaddition of the new duty to the old office, and the requirement of a special and different bond, must be taken as a merger of all liabilities under the bond of office for his duties as commissioner into the new bond. There can be no escape from this conclusion, in view of the terms of the third section of the act of 1852, ch. 164, “ that if any clerk in this State shall fail or refuse to execute his bond as required by the foregoing sections of this act, then and in that case, the Court whose clerk thus fails to give bond' as above stated, shall forthwith declare said clerk’s office vacant, and shall forthwith proceed to fill said vacancy as now. required by law in cases of vacancy. A question like this came before the Supreme Court of North Carolina in the case of the State v. Bradshaw, and it was held that “ where a statute requires a bond from an officer for the faithful discharge of his duty, and a new duty is attached to the office by statute, such bond, given subsequently to the latter statute, embraces the new duty and is a security for its performance, unless where, when the duty is attached, a bond is required to be given specifically for its performance. 10 Ired., 229.
The offices of receiver and commissioner were at com’mon law appointments of special trust which might be accepted or declined by the clerk, but which could not be forced upon him. Under the act of 1852, *655 tbe office of commissioner becomes an integral part of that of clerk, which he is not at liberty to decline without surrendering the,office of clerk also. And it is under this act that the rights and equities of these parties are to be determined. He covenants in the one bond for the faithful performance of his duties as clerk. At common law the duties of a commissioner were not embraced in the duties of clerk, but they were well understood and defined in the bond itself, and for his default as commissioner his sureties must stand or fall upon what is the clear covenant of his bond as such. The defendants were bound upon the covenants of their bond as commissioner, only for the proceeds of sales made by their principal under the orders and decrees of the Court which he failed to pay over and account for. For the proceeds of sale made by his predecessor, which fell into his hands upon his succeeding to the office, and for all moneys that came into his hands otherwise than by sales made by him, and for any moneys which, though they came into his hands as commissioner, were nevertheless retained under the orders of the Court, and converted into a trust fund, which he failed to account for, the defendants would be liable on the bond of office which covenants for the faithful discharge of the duties of clerk and master. The undertaking of a surety can not be extended beyond the terms of the contract into which he has entered. McGooney v. State, 20 Ohio R. 93. Thus it was held that sureties in a bond limited in condition to the faithful performance by the principal of his duties as a member of the board of *656 public works can not be made liable for bis default in not accounting for money received as an acting commissioner. State v. Medary, 17 Ohio, 554.
The real intent and not the literal meaning of a condition is to govern. Cooke v. Graham, Admr., 3 C. , 229. In an official bond the words well and faithfully to execute the office and in all things relating to the same well and faithfully behave, mean faithfully to perform the trusts reposed. Bank US. S. v. Brent, 2 Cr. C. C., 696; Union Bank v. Forrest, 3 Cr. C. C., 218. And so it is said that the condition of an official bond well and truly to execute the duties of the office includes not only honesty, but reasonable skill and diligence. Miner v. Mechanics Bank of Alexandria, 1 Pet., 46. Thus also, it is held that the sureties of an officer upon a bond conditioned for faithful performance of the duties of an office are liable for the performance of all duties imposed upon him which come within the scope of his office, whether imposed by laws enacted prior or subsequent to the execution of the bond. Governor of Illinois v. Ridgeway, 12 Ill., 14; People v. Leet, 13 Ill., 261; Comph v. People, 12 Ill., 290.
The defendants then would be liable on the bond for the faithful discharge of the duties' of the office of clerk, for the non-performance of such duties as fall within the scope of that office, and on the bond as commissioner for a breach of the special condition of that bond, but not upon both. And this brings us to the consideration of the extent of that liability upon either. bond.
It is insisted on behalf of the complainants that *657 these official bonds bear interest from tbe breach, or at least from the time of the demand, or the bringing of an action for recovery under them. Such has not been understood to be the law in this State. Interest is defined to be the compensation which may be demanded by the lender to the borrower, or the creditor from the debtor, for the use of money. Code, 1943. Our statute provides that all bills single, bonds, notes, bills of exchange, and liquidated and settled accounts, signed by the debtor, shall bear interest from the time they become due, unless it expressed that interest is not to accrue until a specific time therein mentioned. Code, 1945. By another section it is provided that ' in actions brought on bonds and agreements for the payment of money, or with collateral conditions, and recovery had by the plaintiff, the judgment shall be entered for the stipulated penalty, to be discharged by the payment of the principal and interest due thereon, or the damages assessed by the jury. Code, 2976. . The judgment under this section can not exceed the “ stipulated penalty.” The bond as commissioner in this case is in the penalty of five thousand dollars, and the sureties are only bound to this extent. As to the principal, it is said that the amount secured is the real debt which he is both legally and equitably bound to pay, whether more or less than the formal penalty of the bond. 1 Mass., 308: 2 Dall., 252; 2 Gill, and J., 254. But the rule is different as to the sureties. The penalty can not be exceeded. Overall v. Babson, 2 Yerg., 71. Thus it is held against principals when the sum due *658 without interest equals the penalty, that interest is recoverable as damages beyond the penalty. 2 Saund., 106; 7 Tenn. R., 447; 6 Paige, 92; Reg. & M., 105; 3 Cai., 48; 1 Gall., 348. A surety is not chargeable beyond the penalty, as was held on a review of many authorities. 3 Con., 151; 6 Paige, 88; Farrar v. U. S., 5 Pet., 373. A judgment rendered against surety as well as principal for an amount exceeding the penalty is erroneous and should be reversed, at least as to the surety. Raynor v. Clarke, 7 Barb., 581.
It being therefore the well settled doctrine of the common law that as against the surety at least the recovery can not exceed the penalty of the bond, any modification of the doctrine by statute can not be assumed without a clear and express provision to that effect. And no such intention as to official bonds is manifest in the terms of the statute. Indeed the contrary intent is imported in the very fact that the statute under which the bond is given is silent upon the subject, and the authority is given to the court to fix the penalty without limit as to its maximum amount. The payments then by one of the securities having overrun the penalty of the bond as commissioner, and having been made after the defalcations of which the complainants seek to charge the defendants, the question recurs how do these payments affect the liability of the other securities on this bond? It was the payment of a valid subsisting debt due from all the sureties under the condition of their bond. The justice of the demand is not disputed) nor is the fact contested that the liability accrued upon the bond *659 as commissioner. It was not therefore an officious or illegal, or in the sense of the law a voluntary payment. It was intended as a discharge of the bond and to save the co-securities harmless. It was paid in good faith for this purpose, and with the understanding that the penalty was thus extinguished. In the view of a court of equity, before which the complainants have brought these defendants, what ' is the effect of this proceeding? The instincts of natural justice are not always the mandate of equity. The law sometimes interposes an arbitrary rule to qualify, if not to paralyze, the instincts of natural justice; and equity, malleable as are its remedies, must not run counter to the law.
It is argued that the State is the payee of this bond and held the same in trust as an indemnity for all losses to any of its citizens by a breach of its conditions; that any payments on account of its broken covenants should have been made on the demand of the State; and that payments without judgment were payments without an ascertained indebtedness.
If the complainants had made it appear that the debts to the amount of $10,395 actually paid by Dr. Blakemore on account of the breach of the commissioner’s bond under which only $5,000 could have been demanded, were not bona fide debts and due upon this bond, then their equi ties would be presented in a different aspect. But we have the undisputed facts here that the debts of the sureties had accrued under this bond; that they were valid debts which might have been recovered in an action; that *660 they were, paid expressly in discharge of the penalty of the bond; that they were paid after the debts of complainants accrued and in excess of the penalty of an amount more than $5,000; and it is gravely argued that all this amounts to nothing because these payments were made without a lawsuit.
To this we might reply in the words of Lord Denman already cited: “No man is entitled to inflame his account against another by incurring additional expense in an unrighteous resistance to an action which he can not defend.”
But it is ingeniously said that this payment was made by the father for his son, and is but the payment of the Clerk himself at last, and that in this view the covenants and obligations of the bond are still intact as to parties whose claims were not so paid.
We hold upon the facts before us that the payments were made to save the co-securities harmless, as well as to avert the threatened exposure of the son. The parties whose money had been squandered were about to sue the securities, and to prevent this, and to indemnify the co-securities, as well as to save the reputation of his son, this co-security came forward and paid the penalty of the bond. The fact that he voluntarily relinquished the right of contribution can not change the legal effect of the payment. There can be no doubt, as has been held, that “co-securities otherwise entitled .to contribution may, by agreement aipong themselves, so far sever their unity of interest and! obligation as to terminate the right of contribu *661 tion.” Moore v. Isley, 2 Dev. & Batt. Eq., 372. And there can be as little doubt that the payment by one to save another harmless is a good payment, and if made to the extent of the penalty is an extinguishment thereof. Then, where one had paid the debt avowedly to save the other harmless, and afterwards action was brought ■ to have contribution, it was held that the right to contribution is an equity, and may be rebutted by proof that the payment was made to save the other harmless. 4 Zab., 702; 2 Kern., 462.
It is the misfortune of complainants, and not the fault of defendants, that this bond was not larger. The penalty might have been fixed at fifty thousand dollars, but the Court saw proper to fix it at five thousand. It has performed its office, its penalty is extinguished, and upon no sound principle can it be galvanized into life again to be made the instrument of wrong and injustice.
Nor can the fact that some of the sureties have as yet paid nothing under this bond affect the legal question. With the private arrangements of the defendants the complainants have nothing to do. They became security for the son at the instance and request of the father. The father had a right to do as he pleased with his own. The suretyship was a sufficient consideration for the indemnity he has given them. The fact that he relinquishes his right to contribution was his own concern. He had a right to do it. It results therefore that the bond as commissioner is satisfied and extinguished, and there can be no recovery upon it. The agree *662 ment upon tbe part of the sureties to continue bound does not change the legal effect of the payment of the penalty of the commissioner’s bond made expressly to save them harmless from liability upon that bond. The extinguishment of their liability upon that particular bond did not relieve them from their covenants on the other three bonds. They were still bound upon them to the extent of their respective penalties, less the amount already paid upon either.
The complainants will be entitled to a decree on the “bond of office” to the extent of its penalty for all such demands as properly fall within its condition, according to the principles of this opinion. The defendants will be credited with all payments made by them, or by Dr. Blakemore, for the indemnity on claims which would be recoverable under said bond of office. A full account will be taken of the payments and the account upon which they were made, — classifying them so as to show to which bond they should be lawfully applied, — and to this end the cause will be remanded to the Court below for said account, and for further proceedings in accordance with this opinion.
It is not intended to disturb the decree of the Chancellor on the note for $2,490, or executed by James A. Blakemore and J. C. Guild on account of the Walsh defalcation, that part of the decree not being appealed from. The principles of this opinion settle the rights of the parties as to the amount already assumed or paid on the same, as well as to the balance of that fund, as of all others.
Under the peculiar facts in this case, we think the *663 costs of this Court should be paid, one-half by the complainants and the other by the defendants. The costs below will abide the judgment of the Chancellor upon the final determination of the cause.
Freeman and McFarland, J.J., dissented.