Railroad v. Fidelity & Guaranty Co.

_LOUISVILLE & NASHVILLE RAILROAD COMPANY *v.* UNITED
STATES FIDELITY & GUARANTY COMPANY *et·al.*

(*Nashville.*   December Term, 1911.)

‾1. COMMON CARRIERS. Shipment to consignor's own order
with draft attached with directions to notify purchaser is
notice to carrier not to deliver till draft is paid.

_A shipment of goods to the shipper's own order, with draft on the
purchaser attached to the bill of lading, with directions to the
carrier to notify the purchaser, is an unmistakable indication
amounting to notification by the shipper to the carrier that the
title to the goods will not pass, and that its duty to deliver will
not arise, until the draft has been paid and the bill of lading has
been taken up and presented to it. (*Post, pp.* 664, 665, 674, 675.)

ᵖ Cases cited and approved: Bank v. Cummings, 89 Tenn., 609;
Charles v. Carter, 96 Tenn., 607, 615; Railroad v. Bank, 123
U. S., 727; Bank v. Railroad, 81 Ga., 221; Stockyards Co. v.
Westcott, 47 Neb., 300; Weyland v. Railroad, 75 Iowa, 573;
Railroad v. Bank, 77 Ark., 482; Electric Co. v. Railroad, 72 S.
C., 255; Lyons v. Railroad, 119 N. Y. Supp., 703; Lyons v. Rail-
road, 136 App. Div., 903, 120 N. Y. Supp., 1133.

˄2. SAME. Same. Delivery of goods without taking up bill of
lading to which draft was attached is a conversion, when.

‾ Where a common carrier, without taking up the bill of lading un-
der which the shipment was made to the shipper's own order,
with draft on the purchaser attached, with directions to notify
the purchaser, delivers the goods to the purchaser, without re-
ˏ quiring the prepayment of such draft, it is guilty of a conver-
ː sion; and the failure of the shipper to recover the goods from
the purchaser after such wrongful delivery would not relieve the
carrier from liability for conversion. (*Post, p.* 675.)

ᶜ Cases cited and approved: Railroad v. Phillips, 108 Md., 285;
.Railroad v. Fay, 89 Ark., 342.

Railroad v. Fidelity & Guaranty Co.

3. **SAME. Evidence insufficient to show a custom to deliver goods without surrender of bill of lading to which a draft was attached.**

In a common carrier's suit against its clerk and the surety on his bond, to recover for his wrongful delivery of goods consigned to the shipper's own order, with draft against the purchaser attached to the bill of lading, made to the purchaser, without requiring the payment of such draft and the surrender of the bill of lading properly indorsed, as required by a rule of the carrier, the evidence is stated, reviewed, and held to be insufficient to show a custom to deliver such shipments to the purchaser without requiring the payment of such draft and surrender of such bill of lading. (*Post, pp.* 664-677.)

4. **SAME. To establish waiver of rule for protection, carrier must have knowledge of custom of its receiving agent in violating the rule.**

Before it can be properly held that a common carrier has sanctioned a custom to violate its rule that its receiving agents must not deliver goods consigned to shipper's order, with directions to notify the purchaser, except upon the purchaser's surrender of the original bill of lading properly indorsed, it must appear that the habit of violation among the carrier's servants was so constant, open, and general that no reasonable conclusion could be reached other than that the responsible officers of the carrier must have known it; for the knowledge of the adoption of such custom by a subordinate officer must be brought home to the carrier, or there must be such facts in existence in connection therewith as would impute knowledge to the carrier, in order to show its waiver of its said rule. (*Post, pp.* 676, 677.)

5. **FIDELITY INSURANCE: "Culpable negligence" of employee, as defined in a fidelity bond and as applied to the facts, is held to be established.**

Under a fidelity bond to secure the faithful performance of his duties by a clerk in a railroad freight office, which exempted the insuring bondsman from liability for any loss by mistake,

Railroad v. Fidelity & Guaranty Co.

accident, or error of judgment on the part of any employee; or by robbery, unless by or with his connivance of "culpable negligence," and defining such negligence to mean the "failure to exercise that degree of care and caution which men of ordinary prudence and intelligence usually exercise in regard to their own affairs of the same character," the clerk's delivery of goods consigned to the shipper's order, with draft against the purchaser attached to the bill of lading, made to the purchaser without requiring the surrender of the original bill of lading properly indorsed, in violation of the carrier's rule, was "culpable negligence" within the meaning of the bond. (*Post*, *pp.* 677-679.)

6. SAME. Evidence held to show no violation by insured of provision exempting insuring bondsman from liability.

In an action on a fidelity bond to secure the faithful performance of duty by a clerk in a railroad freight office, exempting the insuring bondsman from liability, if at any time the railroad company suspected or had knowledge of the fact that the clerk was negligent or unworthy of confidence, and did not immediately notify the bonding company, the evidence is stated, reviewed, and held not to show that the railroad company had violated the provision exempting the bonding company. (*Post*, *pp.* 679-683.)

7. SAME. Same. Evidence held to show no violation by insured of provision for use of precautions to detect wrongful acts by insured employee.

In an action on a fidelity bond to secure the faithful performance of duty by clerk in a railroad freight office, the evidence is stated, reviewed, and held not to show a violation by the railroad company of a provision in the bond that it should use all reasonable precautions to detect any act on the part of the clerk which would tend to render the bonding company liable for any loss, by an audit of his books, etc. (*Post*, *pp.* 683-685.)

8. SAME. Same. Same. "Charges" mean "freight charges," and not value of shipment for which draft is attached to bill of lading forwarded through other agencies for collection.

Railroad v. Fidelity & Guaranty Co.

The inspection report showing that the insured employee per-mitted freight to be delivered without payment of "charges" does not show a delivery of freight shipped "order—notify," without requiring the surrender of the original bill of lading properly indorsed; for the word "charges," under the rules and inquiries for the inspectors to answer, mean "freight charges," pertaining to the revenue of the railroad company, and not money due for the value of shipments with drafts at-tached to bills of lading, and sent through other agencies for collection from the purchaser. (*Post, pp.* 680-683.)

9. ASSIGNMENTS OF ERRORS. Not waived by failure to urge and press point in briefs and argument; renewed by petition to rehear.

Where, in an action on an indemnity bond, insuring the faithful performance of duties by an employee, and in the penalty of ten thousand dollars, a judgment was rendered by the chan-cery court against the indemnity company for the penalty of the bond, with interest, and costs, and the appellant (indem-nity company) assigned as error that the chancery court erred in adjudging it "liable for $10,000 and interest and costs for any amount," under which assignment the supreme court could have acted on the matter of interest, the point or ques-tion was not waived on the hearing by a failure to urge and press the same in the briefs and argument; and the appellant might bring it to the special attention of the court in the form of a petition to rehear. (*Post, pp.* 687-689.)

10. INTEREST. None on penalty of indemnity bond, with col-lateral conditions, before judgment in lower court.

Under the statute (section 4704 of Shannon's Code) providing that judgment may be entered, upon bonds with collateral con-ditions, for the stipulated penalty, to be discharged by the pay-ment of the principal, and the interest due thereon, or the damages assessed by the jury, interest cannot properly be al-lowed on the penalty of a fidelity bond, prior to the judgment in the lower court, where the bond expresses only a maximum amount of liability, dependent upon the breach of duty by the

employee whose conduct was insured, and the exact amount of liability is measured by the extent of the breach, such bond is one with collateral conditions. (*Post, pp.* 689-690.)

Code cited and construed: Sec. 4704 (S.); sec. 3690 (M. & V.); sec. 2976 (T. & S. and 1858).

Cases cited and approved: Cherry v. Mann, Cooke, 268-273; Overall v. Babson, 2 Yerg., 71, 72; State v. Blakemore, 7 Heisk., 638; Rhea v. McCorkle, 11 Heisk., 415, 416; Fidelity & Guaranty Co. v. Rainey, 120 Tenn., 357, 377, 405, 506.

Case cited and overruled: Bank v. Guaranty Co., 110 Tenn., 10.

11. **FIDELITY INSURANCE. Bonds are treated as insurance contracts as to nature and extent of liability, but they are in form bonds whose penalty cannot be exceeded in judgment.**

While bonds guaranteeing the fidelity of employees or agents, executed for a consideration by companies organized for and engaged in that business, are treated by the courts as insurance contracts, when under construction with a view to ascertain the nature and extent of the liability assumed, and such companies are not in that respect entitled to the favorable consideration accorded to gratuitous sureties, still they are nevertheless in form bonds with collateral conditions, limited by a sum expressed therein, called the "penalty," and the judgment cannot exceed the penalty. (*Post, pp.* 690, 691.)

Code cited and construed: Sec. 4704 (S.); sec. 3690 (M. & V.) sec. 2976 (T. & S. and 1858).

12. **REHEARINGS. Office of petition to rehear is to call the attention of the court to authorities and matters overlooked, and not to reargue considered points.**

A petition for rehearing should never be used for the purpose of rearguing the case on points already considered and determined, unless some new and decisive authority has been discovered, which was overlooked by the court; for the office of a petition to rehear is to call the attention of the court to mat-

Railroad v. Fidelity & Guaranty Co.

ters overlooked, and not to those things which counsel sup-
poses were improperly decided after full consideration. (*Post,*.
*pp.* 691-693.)

Case cited and approved: Jenkins v. Eldridge, 3 Story, 299, Fed.
Cas. No. 7,267.

FROM DAVIDSON.

Appeal and writ of error from the Chancery Court of
Davidson County.—JOHN ALLISON, Chancellor.

P. D. MADDIN and JOHN BELL KEEBLE, for complain-
ant.

C. T. BOYD and E. L. MCNEILLY, for defendants.

MR. JUSTICE NEIL delivered the opinion of the Court.

The bill in the present case was filed for the purpose
of recovering the sum of about $12,000 and interest, now
amounting in all to about $20,000, which principal sum
the railroad company claims it paid to certain customers
of the road to cancel a liability brought upon it by the
negligence of one of its employees, T. C. McCampbell,
who was chief clerk in complainant's South Nashville
office. The Fidelity & Guaranty Company executed to
the complainant, for a consideration, a bond to secure
the faithful performance by Mr. McCampbell of his

duties as such clerk. The action was brought against McCampbell for the whole liability, and against the Fidelity & Guaranty Company to the extent of its bond, which was not large enough to cover the whole sum claimed. Judgment was rendered on the bond for $16,860 and costs, and against T. C. McCampbell for $19,953.77. The Guaranty Company appealed, and McCampbell brought the case here by writ of error, and both defendants have assigned errors.

It is alleged that through the culpable negligence of Mr. McCampbell certain cars shipped to the order of the consignors, with directions to notify C. D. Smith & Co., were delivered to the latter, without the production of the bills of lading; that these cars contained wheat, and were each of the value of $600 to $1,000; that by reason of such delivery without the production of the bills of lading the complainant railroad company became liable to the consignors for the value of the goods contained in the cars, and that C. D. Smith & Co. never made this liability good.

It is admitted by the defendants McCampbell and the Fidelity & Guaranty Company that the cars were delivered, as stated, to C. D. Smith & Co., without the production of the bills of lading; but it is insisted that there was no culpable negligence in making such delivery, because Mr. McCampbell in so delivering the cars acted in accordance with an established custom of the company, and as he was expected to do in the ordinary course of the business. Other defenses claimed will be stated further on as they arise out of the facts.

It appears from the record that the nature of the
shipments referred to was this, *viz.*:  Dealers in other
cities, who had sold goods to other dealers and to mills
here in Nashville and were unwilling to pass the title
without previous payment of the purchase price, shipped
goods to their own order, with directions in the bills of
lading to notify the persons to whom the sales had been
made; that these bills of lading were attached to drafts
at the points of shipment, and these drafts were placed
in bank for collection, and were forwarded through the
initial banks to other banks in Nashville, and it was
expected that the persons to whom the goods had been
shipped would in each instance call at the bank and pay
the amount of the draft and take up the bill of lading
and present it to the railroad company, and then pro-
cure the delivery of the cars.  At the same time that the
bills of lading were issued in the form above mentioned
there was a waybill given to the conductor of the train
on which the goods were to be transported, showing that
the cars referred to were shipped to order of the con-
signor, or, as previously stated, that they were bills
"order-notify."  A waybill to the same effect went to the
office of the railroad company at the point of delivery;
that is, in the present instance, at Nashville.  It was
the duty of the agent at Nashville, either personally or
through his clerks, to go out into the yard of the railroad
company every night and take down the numbers of the
cars there found.  This duty was performed by the night
clerk, who arrived at the yard about five o'clock in the
afternoon, and left at seven the next morning.  It was

his duty to enter the numbers of these cars on a ruled sheet, with proper spaces in which to write information concerning the cars, indicated by a heading over these spaces. This was called the "abstract." The night clerk also had access to the conductor's waybills, and from these he would sometimes indicate whether the cars were straight shipments or "order-notify" shipments; but he was not bound to make this indication. The abstract was returned to the office of the agent at the South Nashville office, of which Dr. Bumpas was in charge, and there passed under examination by Mr. McCampbell, the chief clerk. He had before him, not only this abstract, but the waybills, and it was his duty to compare the car numbers with these waybills, from which he would learn whether they were "order-notify" shipments or straight shipments, and would indicate the fact opposite each number. Upon the consignee being notified, it was his privilege to give an order to the office of the agent indicating the point or place where he wished the car delivered. The chief clerk was accustomed then to enter upon the order book the directions so given. He then made out a switching list, which constituted the authority of the yard foreman for delivering the cars therein mentioned to the points therein directed. This switching list also contained the date under which the delivery was directed. There was also another paper, which was made out by the car service association, called the "car service record." The purpose of the existence of the car service association was to facilitate the delivery and unloading of cars and their return into the

active channels of commerce, and to thereby prevent their being used for storage by consignees. The date being fixed when the delivery was made, and, under the car service record, that on which the car was re-delivered to the railroad company, the time was thus ascertained for which consignees should be charged for retaining the car at the rate of one dollar per day after the lapse of a certain free time not necessary to be mentioned more specifically in this case. There was also kept in the office of Dr. Bumpas, but in no other office on the line of railway, a set of little books known as "bills of lading books." These were used to keep a record of bills of lading surrendered to the railroad company on "order-notify" shipments. These various papers and the books just mentioned are necessary to a proper understanding of one of the leading controversies in this case.

The rule of the company upon the subject of "order-notify" shipments was as follows:

"123½. In waybilling shipments consigned 'to order,' forwarding agents will in every instance show on way-bills the name and address of party to be notified, and receiving agents must not deliver such shipments until surrender of original bill of lading properly endorsed."

It is insisted by defendants that there was a custom of the railroad company whereby its agents were authorized to disregard this rule, and that it had been disregarded for a considerable time, more than a year at least, at the South Nashville freight office. Mr. McCampbell testifies that such was the custom, and he undertakes

to fortify his statement by reference to the bill of lading books above mentioned, and a comparison of the dates there shown for the delivery of the bills of lading that had been issued on "order-notify" shipments, and the dates of delivery of cars shown by the switching lists, and the date of the return of the cars to the railroad company by the car service record. He testifies that by this comparison in hundreds of instances the cars were delivered to the consignees under such shipments from one to five or ten days before the bills of lading were surrendered to the railroad company, and that in some instances the difference was as much as thirty-five and even forty days; that deliveries of this kind were made to the Liberty Mills, the Cumberland Mills, the Model Mills, to Neil & Schofner, to Mr. Brooks, to C. D. Smith & Co., and others. His reliance upon the bills of lading books is based on the fact that these books contained the true date on which the bills of lading were surrendered to the railroad company. It appears, however, upon an investigation of these books, that the entries were not made daily; that often there was an interval of five and sometimes ten days between entries; and that several of these little books were being cared for at the same time—at least two or three of them at one time. He admits that these intervals occurred, and says that it was not the custom to make the entries daily, but only when he could get time from other duties to do this, but that in the meantime he endeavored to keep the bills of lading in regular sequence as they were delivered, and to keep them in the same sequence when he came to write

the car numbers down into the bills of lading books;
and it is a fair deduction from his testimony that in the
meantime the entries were really kept in this sequence.
Mr. Whitworth, who was night clerk at the time that
Mr. McCampbell was chief clerk, says that the effort
was to enter them in the order in which they came in,
but that he does not know whether the entries were so
made or not; nor in fact does Mr. McCampbell know
whether he succeeded in getting them in the proper
sequence, as an examination of his whole testimony
would indicate, especially his cross-examination.

A singular thing, however, about this proof of custom
is that no one seems to have had knowledge of it except
Mr. McCampbell and C. D. Smith & Co., to whom he
let the goods go, which was the origin of the present liti-
gation.    The various millers and dealers to whom he
testifies that he delivered goods prior to the surrender
of the bills of lading say that they never asked such
indulgence and never received it; that Dr. Bumpas, the
agent at the South Nashville office, was very strict upon
this subject, always insisting upon the bills of lading,
and was really brusque and offensive about the matter;
that Mr. McCampbell, while more pleasant, was equally
positive in his enforcement of the rule, so far as they
were concerned.    In response to, or in explanation of,
this evidence, Mr. McCampbell testifies, and it is so
argued in the brief of his able counsel, that in allowing
goods to be so delivered he had no thought of giving
credit to any of the customers to whom deliveries were
thus made, and it is said in the argument that in all

probability these millers and dealers believed that they were complying with the requirements of the company; that the cars were placed on their several side tracks, or delivered at the points to which they had directed delivery to be made, very often before 9 o'clock in the morning, and that the cars had been unloaded and had been returned to the railroad company before the bank opened, and before these customers could pay the draft with the bill of lading attached and return it to the company; and that while the leading men of these concerns, who were examined by the railroad company, truly state that they knew nothing of any such facts, still their subordinates, who did the actual unloading, knew these facts, and if they had been examined they would have shown such facts. However, the defendants did not examine such subordinate employees as the customers referred to. So the fact remains that these customers all deny that any such deliveries were made to them, but say that before deliveries of the cars to them were made they procured from the banks, and filed with the railroad company, the bills of lading covering the cars.

Another peculiar feature of the matter is that, although Mr. McCampbell discovered, at least as far back as the early fall of 1898, that he had delivered to C. D. Smith & Co., without surrender of the bills of lading, some twenty-eight cars of wheat, of the value of $28,000, for which sum he had thereby rendered the railroad company liable to the shippers, he did not communicate this fact to the agent, Dr. Bumpas, or to any one of the officials of the railroad company. It is claim-

ed, and he says, he had been quite busy, and had not checked up his bills of lading, and when he did so, and discovered that C. D. Smith & Co. were twenty-eight cars ahead of him, it struck him like a thunderbolt; that he immediately telephoned to C. D. Smith & Co., calling off to them the numbers of the cars which had been so delivered to them, and demanding bills of lading; that C. D. Smith & Co. replied that he was correct in his statement, but that they were now unable at once to bring up the bills, and asked for a conference with him on the platform. Mr. McCampbell invited Mr. Smith to his office. Mr. Smith insisted upon a conference on the platform. Mr. McCampbell finally acceded to this, and accordingly they met on the platform. Mr. McCampbell says that Mr. Smith said to him that, if he (McCampbell) would continue to deliver cars to C. D. Smith & Co. as he had been doing without demanding the bills of lading, the firm would be able to take up the liability. Mr. McCampbell says that he did not make any promise to Mr. Smith, but decided in his own mind that he would follow this plan. He was asked whether he informed Dr. Bumpas of what had occurred, and he said, "No." Asked why he did not, he replied that he knew, if he informed Dr. Bumpas, the latter would immediately inform the chief agent, Mr. Saunders, who would inform the railroad authorities at Louisville, and the railroad company would immediately close down on C. D. Smith & Co. and force them into bankruptcy, and probably would lose the whole $28,000. Influenced by these views, he decided that he

would keep the matter to himself and endeavor to work out the liability in the method suggested by Mr. Smith. Matters went along under this arrangement between these two men until about the 11th of March, 1899. In the meantime C. D. Smith & Co. had reduced the liability to about $12,500. At this juncture an inquiry came from a shipper at Louisville, asking whether a certain car had been delivered to C. D. Smith & Co. This was referred by Dr. Bumpas to Mr. McCampbell, and the latter replied that the car had been delivered. An inquiry then came as to whether the bill of lading was surrendered before the car was delivered. This was also referred to Mr. McCampbell, and he replied that it had not been. Two similar inquiries came from St. Louis, with the same result. Thereupon the whole matter was opened to Dr. Bumpas by Mr. McCampbell. He immediately informed his superiors in office, and in this manner the offices at Louisville were notified. The railroad company at once took steps to recover such of the wheat as they could, and did succeed in recovering parts of two car loads, which, on being sold, realized about $1,026. This was credited on the liability, and left a balance of about $11,500, on which the present suit was brought. The railroad company immediately notified the Guaranty Company of the loss, and demanded reimbursement. The shippers have demanded the value of the cargoes from the railroad company. The Guaranty Company did not at once flatly refuse to pay, but desired negotiation, either with a view to settlement, or for the purpose of convincing the rail-

road company, without suit, that it was not liable. The railroad company referred the matter to its attorneys at Nashville, and the Guaranty Company made similar reference to its attorneys. Before these attorneys had conferred, however, Mr. McCampbell had gone before the attorneys of the railroad company at their request, and had made a statement about the matter. He admitted that he had delivered the cars without surrender of the bills of lading; that he knew at the time that he was making the railroad company liable for the value of the cars; and said that he did not know at the time whether C. D. Smith & Co. were solvent or not. But, singular to relate, he made no claim or defense that in so delivering the goods he had acted in accordance with any custom of the company, but excused himself on the ground that he was very busy, and that the deliveries so made were inadvertent. There is another singular fact that in the conference between the attorneys for both sides, wherein the attorneys for the Guaranty Company were endeavoring to convince the attorneys for the railroad company that it was not liable, no claim was made by them that Mr. McCampbell had acted in accordance with any custom of the road to violate its own rule upon the subject.

It is true that, some weeks after Mr. McCampbell had made his statement to the attorneys of the railroad company, he replied, to an article in the "American" charging him with shortage, that he had acted only in accordance with a custom of the business, and that therefore

he had done nothing wrong. It seems to us, however, that if there had been any such custom, it would have been the first defense that Mr. McCampbell would have made when he was called upon by the railroad company for an explanation; also that he would not have failed to impress this fact upon the attorneys of the Guaranty Company, who evidently had also had an interview with him, and it is not to be doubted that, if these attorneys had been put in possession of this information, they would have made, in the negotiations referred to, a stronger effort to convince the railroad company's attorneys that no liability existed because of such fact. This seems to indicate that the defense of a custom to violate the rule was a matter of second thought. Mr. McCampbell testified in his original examination that this was the custom at the South Nashville office and at other offices of this company; but on being requested, on cross-examination, to name another office, he was unable to do so.

In addition to the foregoing considerations, the improbability of the railroad company's authorizing, sanctioning, or tolerating a violation of the rule referred to is inherent. The rule which required that the goods should not be delivered without surrender of the bill of lading was very pointed, and incapable of misconception. It was, moreover, strictly in line with the duty of the railroad company to its customers, since a shipment to the order of the consignor, with directions to notify the consignee, is an unmistakable indication by the shipper to the carrier that the title to the goods will not

pass and the duty to deliver will not arise until the draft has been paid, the bill of lading taken up, and the latter presented to the railroad company. *Bank* v. *Cummings,* 89 Tenn., 609, 18 S. W., 115, 24 Am. St. Rep., 618; *Charles* v. *Carter,* 96 Tenn., 607, 615, 36 S. W., 396; *North Pennsylvania R. R. Co.* v. *Commercial National Bank,* 123 U. S., 727, 8 Sup. Ct., 266, 31 L. Ed., 287; *Boatman's Savings Bank* v. *Western & A. R. R. Co.,* 81 Ga. 221, 7 S. E., 125; *Union Stockyards Co.* v. *Westcott,* 47 Neb., 300, 66 N. W., 419; *Weyland* v. *Atchison, etc., R. R. Co.,* 75 Iowa, 573, 39 N. W., 899, 1 L. R. A., 650, 9 Am. St. Rep., 504, and note pages 512, and 513; *Arkansas Southern Railway Co.* v. *German National Bank,* 77 Ark., 482, 92 S. W., 522, 113 Am. St. Rep., 160; *General Electric Co.* v. *Southern Railway Co.,* 72 S. C., 255, 51 S. E., 695, 110 Am. St. Rep., 600; *Lyons* v. *New York Central & H. R. Co.,* 119 N. Y. Supp., 703; Id., 136 App. Div., 903, 120 N. Y. Supp., 1133. The railroad company, of course, in delivering goods so shipped, would be guilty of a conversion. *Seaboard Air Line R. R. Co.* v. *Phillips,* 108 Md., 285, 70 Atl., 232. And failure of the consignor to recover the goods from the party to whom they had been thus wrongfully delivered would not relieve the carrier of his liability for the conversion. *Midland Valley R. R. Co.* v. *J. A. Fay & Eagan Co.,* 89 Ark., 342, 116 S. W., 1171. It is difficult to conceive how any railroad company would place it in the power of a subordinate to thus cause it to violate its duty daily. The improbability becomes greater when it is remembered that shipments of the kind under ex-

amination here amounted, along the line of the whole
railroad, to an average of $1,000,000 a day, and in the
particular office concerned in the present litigation, the
South Nashville office of the complainant, weekly, the
liability was on an average of from about $350,000 to
$500,000. We cannot believe that any business concern
would knowingly sanction the exercise of so enormous
and destructive a power by a clerk of one of its sub-
ordinate agents. Before the court could reach the con-
clusion that any competent business concern had been
guilty of such folly, the evidence would have to be very
clear and convincing. But, as we have already stated,
no one seems to have known of this custom except Mr.
McCampbell and and C. D. Smith & Co. Dr. Bumpas,
the agent, says that he knew nothing of it. Mr. Whit-
worth, the night clerk, says that he knew nothing of it,
and it does not appear that any other railroad official
knew of it.

But let it be assumed that there was such a custom
in that office; it would by no means follow that the rail-
road company had thereby waived its rule. It would
have to be shown, in addition to the adoption of such
custom by the subordinate officer mentioned, that knowl-
edge of this had been brought home to the railroad com-
pany, or that there were such facts in existence in con-
nection therewith as would impute knowledge to the com-
pany. However, before it can be properly held that a rail-
road company has sanctioned a custom to violate one of
its rules, it must appear that the habit of violation among
the servants of the company was so constant, open, and

general that no reasonable conclusion could be reached other than that the responsible officers of the company must have known it. This is the substance of the rule as laid down in numerous authorities of the highest respectability. 4 Thompson on Negligence, sec. 4163; 5 Thompson on Negligence, sec. 5404; 3 Elliott on Railroads, sec. 1282; 1 Labatt on Master & Servant, sec. 233. And see sections 198 and 200; 26 Cyc., p. 1161.

It is next insisted in behalf of the defendants that they are exonerated under the following clause of the bond:

"The company shall not be liable hereunder for any loss occasioned by mistake, accident, or error of judgment on the part of any employee; or by robbery, unless by or with the connivance or culpable negligence of the employee; and culpable negligence as used in this bond shall be deemed and held to mean failure to exercise that degree of care and caustion which men of ordinary prudence and intelligence usually exercise in regard to their own affairs of the same character."

It is insisted that Mr. McCampbell was very busy at the time he permitted C. D. Smith & Co. to obtain the twenty-eight cars without surrender of the bills of lading, and he was thereby caused to overlook the fact. It is to be observed that this defense is in direct contravention of that previously urged that Mr. McCampbell was justified in making the delivery under a custom of the company to violate its rule; but, passing this, the record fails to show that Mr. McCampbell was so engaged as that he could not attend to this particular duty. He went to his office at 7 o'clock in the morning,

and left at 6 in the afternoon, and sometimes returned after supper and worked until 10 o'clock. He had time to get his usual three meals a day, and at noon walked at least four squares to get that meal. The evidence also shows that the business was not more than one man could comfortably attend to. But, in addition to these facts, Mr. McCampbell had a record of all of the cars which had been shipped under "order-notify" consignments, and it was only a matter of a minute or two for him to look to this record and discover whether a car was under a shipment of the kind last referred to, or under what is called a "straight shipment." It might require several minutes to direct the delivery, but it would require only a moment to refuse it. He would not be justified, under the clause of the bond quoted, in saying that he forgot the rule. It is the duty of employees to keep the rules in mind and act in accordance therewith. Forgetfulness itself is negligence, since proper care will so impress a duty upon the mind as that it will not be forgotten; and the duty to so impress a rule is all the greater when the result of a violation of it will be serious loss to the business of the employer.

To deliver the cars under the circumstances was culpable negligence, within the sense of the paragraph quoted from the bond. Men of ordinary prudence and intelligence, when sending goods to a purchaser at a distant point under a contract that the goods shall not be delivered until the price shall be paid, do not usually permit delivery to take place until the money is received. It would be nothing short of folly to permit such de-

livery, since the safety of the property may in any in-
stance be imperiled. By this form of shipment the seller
protects himself against the possible fraud or insolvency
of the purchaser. By delivering the goods in disregard
of the terms of the shipment, the shipper is subjected
to all the dangers against which he sought to guard him-
self.

It therefore appears that Mr. McCampbell did not
measure up to the rule of diligence and care which the
parties agreed to in the bond.

It is insisted by the defendant the Guaranty Company
that it is not liable because of a violation of the follow-
ing provisions contained in the bond:

"If at any time after the beginning of the term for
which this bond is written the employer suspect, or
there come to the notice or knowledge of the employer,
any act, fact, or information tending to indicate that
any employee is or may be negligent, unreliable, deceit-
ful, dishonest, or unworthy of confidence, the employer
shall immediately so notify the company in writing at
its principal offices in the city of Baltimore, and if the
employer fail or neglect so to do, the company shall not
be liable for any act of omission of such employee occur-
ring thereafter.

"And if at any time after the beginning of the term
for which this bond is written there come to the notice
or knowledge of the employer the fact that any employee
is negligent, unreliable, deceitful, dishonest, or unworthy
of confidence, the employer shall immediately notify the
company in writing of such fact, at its principal offices

in the city of Baltimore, and failure to give such im-
mediate notice shall relieve the company from all lia-
bility on account of such employee."

It is insisted that this part of the bond was violated
under the following facts: The railway company was
accustomed, from time to time, to send inspectors along
its line to investigate its various offices. It was required
of these inspectors that they should appear in the offices
referred to without previous warning and immediately
call for the cash and count it, and also take charge of
the office, and make all such examinations and inquiries
there as would enable them to answer sixty-nine in-
quiries which the company propounded to the inspectors
themselves. It appears that three such inspections were
made along about the time of the occurrence of the
breaches of duty which are the subject of the present
controversy. Several inquiries were made, running from
numbers 39 to 45, inclusive, to elicit information whether
the agents ever delivered freight without payment of
"charges." The inspectors replied in the affirmative.
The inspectors were directed, in case their answers
should be in the affirmative on this subject, to refer to
form 788. It should be stated in this connection that
the railway company permitted freight to be delivered
to certain customers without previous payment of
charges, where permission had been given by the general
freight office to that effect, and such permission was
based upon the known reliability or solvency of the par-
ticular customers. Now, the question is whether the
word "charges" here meant simply freight charges, per-

Railroad v. Fidelity & Guaranty Co.

taining to the revenue of the road, or likewise the money due for the value of cargoes shipped "order-notify," the price of which was represented by drafts attached to bills of lading sent by the shipper to a bank or banks for collection by such bank or banks from the consignee. It is insisted by counsel for the defendant that it did cover such shipments.  An examination of the numbered inquiries to which the inspectors were required to respond on this subject convinces us that reference was had only to freight charges or the revenue of the company.  The inspectors themselves say they had always considered it to have this meaning alone, and never at any time had any idea that it had any bearing upon "order-notify" shipments, so far as concerned the value of the cargo, and that when they made these reports they understood it themselves as referring only to freight charges, and that they had made no examination as to whether the drafts in bank had been paid and the bills of lading surrendered before delivery of the cars.  This meaning is obviously the true one, because the agents had nothing to do with the collection of the drafts in bann.  This was the business of the banks, and, indeed, the consignee could not have lawfully paid these drafts to the railroad company.  The opposite view is based upon an opinion given on cross-examination of the witness C. Quarrier, who was cross-examined by counsel for defendant upon the meaning of rule 257.  This rule is:

"Freight must not be delivered until the freight delivery book is receipted and all charges are paid.

Agents must not give credit to any one without special permission of the general freight agent."

Mr. Quarrier was cross-examined specially upon the meaning of the word "until the freight delivery book is receipted and all charges are paid." He said that the word "charges" here meant freight charges. Counsel for defendant asked him if he did not think it also meant the value of cargoes shipped under "order-notify" bills of lading. He replied that he thought that such bills would also be charges against the car, and that they should not be delivered without payment of the drafts. Counsel for defendant adroitly used this opinion of Mr. Quarrier in endeavoring to solve the meaning of the inquiries which the inspectors above mentioned were required to respond to. Mr. Quarrier did not have these inquiries in mind at all at the time he was examined, nor was his attention at that time drawn to them. When his attention was drawn to that particular subject in another part of the examination, he said, in substance, that the railroad company had never caused inquiries to be made upon that subject at all, because it had not deemed it necessary, on grounds which will be presently stated. As we have said, the inquiries responded to by the inspectors could not have meant any such thing, and we may add, also, that rule 257, which is really immaterial in this connection, had no bearing upon shipments "order-notify," which subject was controlled by rule 123½ already copied into this opinion. In addition, as further showing that the inspectors were not understood as responding to the subject of shipments "order-

notify" in making answers to the inquiries concerning "charges," it appears from these inquiries that under inquiry number sixty-seven the inspectors were required to report whether the agents understood that they were not to deliver "order-notify" shipments without surrender of the bills of lading. The inspectors responded to this inquiry that the agent understood the matter.

It is next insisted that, if the railroad company did not violate the paragraphs above quoted, it violated the following:

"That it" (the railway company) "will at all times during the term hereof take and use all reasonable steps and precautions to detect any act or omission upon the part of any employee which would tend to render the company liable for any loss; and when any employee for whom the company is surety hereunder is acting in the position of joint agent for the employer and any other person, company, or corporation, joint audits of his books and accounts shall be made by the employer and such other person, company, or corporation."

It is insisted that if the report of the inspectors upon the subject of "charges" did not embrace the drafts due upon the "order-notify" shipments, and they were not required to make investigation as to the delivery of this class of shipments prior to the delivery of the bills of lading, then no inquiry was made at all upon this subject, and the railway company violated its duty to the Guaranty Company in not using the precaution required in the paragraph just quoted.

It is proven by the railroad company that to make the regular and continuously repeated investigations suggested an army of clerks would be required, and the outlay would be far greater than the risk; that an experience of more than forty years had justified the conclusion that the risk of such deliveries being made was very small, since only three such instances had occurred in more than forty years; and, furthermore, that there was no pecuniary or other gainful inducement operating upon the mind of any of the company's agents to cause them to make such deliveries. It further appears from the evidence that the inspections made by the railway company in the present instance were such as were accustomed to be made by other first-class railroad systems, including the Southern, the Illinois Central, and several other railway organizations mentioned in the evidence. It is proven that conferences upon this subject had been had between several first-class railroad systems, and it had been settled among them that so small a risk would not justify so great an outlay as would be required to thoroughly prosecute such an inquiry. We are of the opinion that these reasons are sufficient. Certainly where in more than forty years only three such derelictions had occurred out of transactions involving property worth millions of dollars yearly—say in forty years, making a low estimate, $40,000,000—we say that when within that time, and in the handling of property worth so many million dollars, only $3,000 worth had gone astray, a railway company could not be held guilty of negligence in

failing to employ an army of clerks to run down or pre-
vent a risk so small. But it is said by defendant com-
pany that since the present loss had occurred the rail-
way company had taken warning thereby, and had im-
posed upon its inspectors the duty of examining and
reporting upon this phase of the business, and that one
of the inspectors had testified in this case that there
was little difficulty on their occasional visits in accom-
plishing this work, aside from its tediousness; hence it
is argued that no great number of clerks was required
for this duty, unless it should be made a matter for con-
tinuous daily examination at the railway companies',
headquarters. Let this be granted; still the substance
of the reason assigned remains, *viz.*, that the risk had
been found so small during a preceding period of forty
years' experience by the complainant company, and in
the experience of other well-managed railway companies,
and the inducement to a breach of duty in this regard
was so remote, that one could not reasonably anticipate
danger of loss from that source from the negligence or
dishonesty of employees, and it could not be supposed
the parties to the contract had such a contingency in
mind at the time they adopted into their contract the
clause quoted.

The foregoing presents the substance of all the ma-
terial controversies offered for our consideration. There
is no merit in any of them, as we see the case, and the
judgment of the chancellor is affirmed.

Before closing this opinion we deem it proper to say
that we believe Mr. McCampbell is an honest man, and

that his conduct, which is the subject of the present inquiry, was the result only of negligence, induced, perhaps, by an overzeal on his part to hurry the unloading of cars, and the return of cars into the regular channels of commerce; that is, to prevent them from being held loaded too long. Since Mr. McCampbell was discharged by the complainant from its service, he has occupied several important positions with responsible concerns, and no doubt has received and merited their confidence. The errors committed by him while in service of the complainant have probably served as a warning against similar acts.

It is also proper to be noted that while this case has been in litigation since 1899, it reached this court only within this term, and has been disposed of with that promptness which this court has now for many years endeavored to use in disposing of its business, hearing its whole docket at every term. The delay in the lower court was caused by the immense field of inquiry which was explored by the respective counsel in their efforts to produce evidence to sustain their respective contentions. The record consists of five large volumes, and, in addition, exhibits containing thousands of pages. The briefs are very voluminous, covering more than 600 pages. We wish to express to the respective counsel engaged in this controversy our appreciation of the care and skill with which they have prepared and supported their respective contentions. The briefs are models of candor and force. They leave nothing to be desired in

Railroad v. Fidelity & Guaranty Co.

the way of a thorough presentation of all matters which the court was called upon to examine and consider.

### ON PETITION TO REHEAR.

The bond executed by the defendant provides that for the period covered by it, and subject to its conditions and provisions, the company "will make good and reimburse to the employer any and all pecuniary loss of money, securities, or other personal property belonging to the employer, or in its possession as a common carrier, bailee, or warehouseman, sustained by the employer, by or through the personal dishonesty or culpable negligence of any employee, for whom the company is or shall have become surety hereunder, in connection with the duties pertaining to the position to which he has been or may be appointed by the employer, and for which the employee shall be legally liable to the employer. . . . Provided, however, the company's liability on account of any employee shall in no case exceed the amount for which the company shall have become surety hereunder for such employee, which amount is set opposite his name in the schedule." The bond provided that the liability of the Guaranty Company was subject to the conditions and provisions therein contained, and that these should be conditions precedent to the right of the employer to recover. Among these conditions and provisions were those set out in the original opinion.

The amount set opposite the name of T. C. McCampbell was $10,000. This was the full amount of the bond, in so far as it affected the liability of the Guaranty Company for the good conduct of McCampbell. The chancellor rendered a decree for this sum and for interest thereon. The matter of interest is the complaint made in the petition to rehear filed by the Guaranty Company. It is insisted that the penalty of the bond, $10,000 is the full amount of the liability of the Guaranty Company, and that such bonds do not bear interest, although it is conceded that, after judgment is rendered thereon, the judgment will bear interest.

On appeal to this court the decree of the chancellor was affirmed, as appears from the original opinion. No point was made upon this subject, either in the oral or printed argument, and it is insisted by counsel for complainant that this was not included in the assignment of errors, and therefore cannot be considered by the court. This is a mistake. The assignment of errors reads: "The court erred in adjudging the defendant Guaranty Company liable for $10,000 and interests and costs for any amount." The point, therefore, was made in the assignment of errors, although, as stated, it was not pressed in the argument. Under this assignment the court could have acted on the matter of interest, but did not do so because nothing further was said about it in the briefs, and the court supposed that the defendant did not wish to press the point, and therefore it was not considered. We cannot say, however, that the point was waived, inasmuch as it was made in the assignment of

errors in the manner just stated, and therefore it is competent for the defendant to bring it to the special attention of the court in the form of a petition to rehear.

We are of the opinion that the relief asked in the petition must be granted, and interest prior to the date of the judgment below must be stricken out. The nature of the judgment in this class of cases is governed by Shannon's Code, sec. 4704, which reads as follows:

"In actions brought on bonds or agreements for the payment of money, or with collateral conditions, and recovery had by the plaintiff, the judgment shall be entered for the stipulated penalty to be discharged by the payment of the principal, and the interest due thereon, or the damages assessed by the jury, and execution shall issue accordingly."

The bond in question is a bond with collateral conditions, and expresses only a maximum amount of liability; the existence of liability at all depending upon the breach of duty by the employee whose conduct was insured, and the amount of the liability depending upon the extent to which that breach should go. It might be that only a few dollars would be lost by his misconduct, or the whole amount insured. The bond, therefore, was conditional in two aspects: First, as to the liability, dependent upon the compliance of the employer with certain conditions precedent; and, secondly, upon the exent of the breach of duty upon the part of the employee. There was no certain amount contracted for, and

125 Tenn.—44

only a maximum amount dependent upon the conditions aforesaid.

The question whether such interest can be allowed on the penalty has been before this court in several prior cases, in which it has been adjudged that interest could not be allowed. These cases are: *Cherry's Executors* v. *Mann*, Cooke, 268-273, 5 Am. Dec., 696; *Overall* v. *Babson*, 2 Yerg., 71-72; *State, etc.,* v. *Blakemore*, 7 Heisk., 638; *Rhea* v. *McCorkle*, 11 Heisk., 415, 416; *Fidelity & Guaranty Co.* v. *Rainey*, 120 Tenn., 357, 377, 405, 406, 113 S. W., 397.

There is a case apparently sustaining the opposite view; that is, the case of *Bank* v. *Guaranty Co.,* 110 Tenn., 10, 75 S. W., 1076, 100 Am. St. Rep., 765. But what was there said upon the subject was merely an inadvertence occurring at the close of the opinion. The subject was not discussed in that case, nor was any error assigned upon the point. The same learned judge who delivered the opinion in that case likewise delivered the opinion last cited, in which, after his attention was drawn to the point, the opposite and correct view was taken. *Fidelity & Guaranty Co.* v. *Rainey,* supra.

It is true, as insisted by counsel for complainant, that bonds guaranteeing the fidelity of employees or agents, executed for a consideration by companies organized for and engaged in that business, are considered and treated by the courts as insurance contracts, when under construction, with a view to ascertaining the nature and extent of the liability assumed, and such companies are not in that respect entitled to the favorable

consideration accorded to gratuitous sureties. Cooley's Briefs on the Law of Insurance, vol. 1, pp. 1-14, 87, 88, 236-243, 630-638, 782, 783. But nevertheless they are in form bonds with collateral conditions, limited by a sum expressed therein, called the "penalty," and when judgments come to be rendered on them they are governed by the section of the Code above referred to, and the amount of the penalty cannot be exceeded.

The other branch of the petition, questioning the grounds on which the court held the Guaranty Company liable, must be overruled. We sufficiently stated our views upon this subject when the original opinion of the court was delivered on a former day, and nothing new is urged in the petition. A petition for rehearing should never be used merely for the purpose of rearguing the case on points already considered and determined, unless some new and decisive authority has been discovered, which was overlooked by the court. The office of a petition to rehear is to call the attention of the court to matters overlooked, not to those things which the counsel supposes were improperly decided after full consideraton. "During a pretty long period of judicial life," said Mr. Justice Story, in *Jenkins* v. *Eldredge,* 3 Story, 299, Fed. Cas., No. 7267, "it has been my misfortune on many occasions to have differed widely from counsel on one side or the other, in important causes, as to the merits thereof. But this, although a matter of regret, could not, as it ought not, in any, the slightest degree, influence the duties or judgment of the court. The as-

severations of counsel, however solemn, have nothing to do with the facts or merits of causes before the court; and if any judge could be so unstable in his views, or so feeble in his judgment, as to yield to them, he would not only surrender his independence, but betray his duty. However humble may be his own talents, he is compelled to treat every opinion of counsel, however exalted, which is not founded in the law and the facts of the case, to be voiceless and valueless. . . . They" (rehearings) "have been exceedingly rare in this court, I admit, as, in my judgment, they ought to be, unless some plain, obvious, and palpable error, or omission, or mistake, in something material to the decree, is brought to the notice of the court, which had before escaped its attention. But if a rehearing were to be granted upon the mere certificate of counsel, who had argued the cause, that, in their judgment, the decree was erroneous (a certificate which, with great sincerity and readiness, would almost always be given by the counsel), it is obvious that in the great mass of equity causes of a difficult and important nature, in this court, depending upon conflicting views of law, and also upon conflicting and often irreconcilable evidence, a rehearing would be almost a matter of course; and, considering the vast time occupied hearing such causes, there would be little time left for the court to devote itself to any other business, and the other suitors in the court would suffer the most oppressive delays, and often the most irremediable injustice. . . . If rehearings are to be had until the

counsel on both sides are satisfied, I fear that suits would become immortal, and the decision be postponed indefinitely." 3 Story, 299, Fed. Cas., No. 7267.

The judgment will be modified, as to the Guaranty Company, so as to conform to the present opinion.