# JAMES EARLY MASSEY v. ETHEL PEMBERTON.
## —390 S.W.(2d) 709.

Middle Section.  December 4, 1964.

Certiorari Denied by Supreme Court March 1, 1965.

Richard Marshall, Nashville, for complainant.

Wehby & Wehby, Nashville, for defendant.

I

## The Case

SHRIVER, J. The appellant, James Early Massey, brought suit to recover a parcel of real property he had conveyed to appellee, Ethel Pemberton, the sister of his deceased wife.

344

The Chancellor, Honorable Ned Lentz, Part I Chancery Court at Nashville, dismissed the Bill from which action the appellant, (complainant below) appealed.

## II

## The Facts

The essential facts as set forth in the pleadings and supported by the proof are as follows;

On December 19, 1963 complainant, James Early Massey, filed a bill in Chancery Court to have a deed of conveyance of a certain piece of property to Ethel Pemberton, the defendant herein, set aside alleging that it had been acquired from him by fraud and undue influence.

It is shown that on September 13, 1963, Anna Gardner Massey, wife of complainant and sister of the defendant, died at the age of 69 as the result of illness. She had been married to the complainant for about eight years and there were no children born to this union. However, complainant, who was seventy-five years of age at the time of the hearing, had nine children by his previous marriage and has a number of grand-children.

The property in question comprises 5 1/5 acres of land and a house in which complainant and his wife lived until the time of her death, located on Elm Hill Pike, in Davidson County, Tennessee, and it is agreed by the parties that the approximate value of this house and land is $10,000.00.

Said property, at the time of the filing of the bill herein, was encumbered by a mortgage indebtedness of approximately $1,500.00, payable in monthly installments of $43.75. This property was held by the complainant and his late wife as tenants by the entirety, hence, at her death the title was vested in him in fee.

After the death of complainant's wife all of the funeral arrangements were handled by the defendant, Ethel Pemberton. The expenses of the funeral were paid out of the proceeds of a burial policy and a Social Security check received by complainant, leaving a balance of about $35.00 which was paid by the defendant.

It is shown that during the eight years that defendant's sister was married to the complainant defendant visited complainant and his wife about once a week and on these occasions she would generally carry something in the way of food or provisions for her sister and brother-in-law, and, from time to time, would see that they were provided with transportation when needed. In addition to this, defendant would frequently call by telephone to inquire of the health and well-being of her sister. After complainant's wife died on September 13, 1963, complainant went to the home of his son, Hubert Massey, where he stayed for about five days. Then, on September 18, 1963, defendant with her daughter and a friend went to the Hubert Massey home to see the complainant saying that she had been informed that complainant wanted to see and talk with her. On this occasion complainant went home with the defendant where he remained until September 23, 1963, at which time he returned to the home of his son, Hubert Massey.

A question was raised in the pleadings and proof as to his being under the influence of sedatives when he signed the deed to defendant and, it is shown that at the time he went to the home of the defendant he carried with him some "nerve pills" and "sleeping pills" which had been prescribed for the wife of Hubert Massey but which were given to the complainant to help quiet his nerves and

help him to sleep, as he was in a highly nervous condition at the time.

According to the testimony of the defendant, on Thursday, September 19, 1963, while at the home of the defendant, complainant told her that he wanted to have his home place deeded to her and wanted to get it done as quickly as possible. The defendant testified that she told him that the first thing they should do was to go to the Social Security Office and see about getting his Social Security taken care of. At the Social Security Office a check for $208.00 was issued to him and he was told that he would be given approximately $55.00 a month in Social Security benefits thereafter. Defendant further testified that he stated to her, ''There is one more thing I want to do. I want to go to town and see Harry Nichol about having that deed changed to you.'' She then said ''Now Early, is that what you want to do?'' And he replied, ''Yes, it is,'' to which she replied, ''Well, all right, we will go.'' They went to the office of District Attorney Harry Nichol and were told by General Nichol that he did not handle such matters and he suggested that they go to the office of Mr. William Hofstetter, where they went, on the following day and had the deed drawn conveying the property to the defendant reciting a consideration of $1.00 and love and affection.

Mr. Hofstetter testified that when complainant came to his office he said that he wished to convey his property to the defendant, that his wife had primarily been the individual that had purchased this property and he wanted her sister to have it.

In this connection it is interesting to note that it appears from the record that the property in question was acquired by the complainant before he married de-

fendant's sister and that, after he married the second time, he had the deed changed so as to convey the property to him and his second wife as tenants by the entirety.

Mr. Hofstetter's secretary, Mrs. Eunice Miller, testified that at the time of the acknowledgement of the deed by the complainant, he stated that the reason he was making the conveyance was because Mrs. Pemberton had been so good to him and his wife.

It is further to be noted that complainant, throughout his testimony, insisted that he had no recollection whatever of going to the office of Mr. Hofstetter and of signing the deed or of making this transfer of his home place to the defendant.

After leaving Mr. Hofstetter's office the parties had lunch at the lunch counter in the Stahlman Building and complainant does remember this lunch. When they had finished same defendant went to the Court House and had the deed recorded the same day it was signed.

Mrs. Grace Jones, who was with the complainant and defendant on the occasion of the execution of the deed to defendant testified that complainant asked her not to say anything about the transaction. Again, the complainant testified that he had no recollection of making such a statement.

Defendant testified that after the deed was delivered to her and recorded, she saw the complainant from time to time and that he never expressed any regrets about having deeded the property to her and that the first time she knew that he was dissatisfied about it was on December 19, 1963 when process was served on her and a copy of the bill in Chancery Court was delivered to her.

In the interim, it is shown that the only income that the complainant had was his Social Security check for $55.00 a month which he promptly endorsed and turned over to the defendant to be used by her in paying on the mortgage indebtedness, the light bill, and other expenses. The record also shows that this real estate, worth approximately $10,000.00, was the only property owned by this complainant except a few personal items of almost no intrinsic value.

Some evidence was introduced on behalf of defendant to the effect that a strained relation existed between the complainant and his children and that his children had neglected him while the defendant had been attentive to him and his late wife.

In response to this question, counsel for complainant recalled Hubert Massey, son of complainant, to the witness stand and questioned him regarding the relationship of his father to his children and the fact that he, the son, had helped build the house on the property which complainant deeded to defendant, whereupon, the Chancellor interrupted and had the following to say;

"THE COURT: Mr. Marshall, if you will permit me to interrupt you, I think the whole proof shows that these two sons who are here in court have not been neglectful of their daddy, and as far as the others are concerned, they are not guilty or it has not been brought out as far as the proof is concerned, I don't know about that, whether good or bad. But as far as these two sons are concerned I am satisfied in my mind that they have been kind and thoughtful of their Daddy.

MR. MARSHALL: We will rest then. Come down, Mr. Massey.''

## II

### Assignments of Error

There are five assignments of error, the first of which is as follows;

"The Chancellor erred in not sustaining Appellant's Bill and in finding and holding and decreeing in favor of the Appellee, because under the proof in the cause it is clearly shown that the Appellant, a person in poor health, aged, weak and infirm, had executed a conveyance in favor of the Appellee which conveyed to her the only property he had and left him impoverished, this being done while the Appellant was under the influence of the Appellee and was done without the Appellant having the advice and assistance of some third party to advise him of the consequence of his act and also because the burden of proof was on the appellee, under the circumstances, to show that the Appellant had received independent or disinterested advice, and therefore the transfer cannot stand."

Assignment No. 2, is based on the proposition that there was no consideration for the conveyance of the property in question to defendant.

Assignment No. 3, complains of the refusal of the Chancellor to permit the appellant to be examined by a doctor as to his mental capacity and to amend his bill so as to make such examination pertinent and within the pleadings.

Assignment No. 4, asserts that it was error for the Chancellor to refuse to permit complainant to amend his bill so as to charge that there was a confidentital relationship between complainant and defendant at the time of the transfer.

Assignment No. 5, is a summary and reiteration of the other assignments.

## IV

As is seen from the foregoing statement of facts, we have for consideration the rather unusual and unique situation of a man seventy-five years old, in poor health, the father of nine children and a number of grand-children, who, without monetary consideration, and without any mutual promise of future companionship or assistance on the part of the transferee, made a deed to his home place, worth approximately $10,000.00, which was the only property of any value that he possessed in the world, thus, leaving himself impoverished and without any means of livelihood or income except $55.00 a month Social Security benefits which he also gave to his sister-in-law, the defendant, to be used in paying on the mortgage indebtedness of some $1,500.00 and other expenses. Incidentally, it appears in the record that he and his late wife had received Social Security checks, her's being $62.50 and his $33.50, which they customarily turned over to defendant, to be used by her in paying on the mortgage indebtedness and other expenses of complainant and his wife.

As hereinabove indicated, no rational or reasonable explanation as to why Mr. Massey chose to denude himself of his entire estate in favor of a sister of his deceased wife to the exclusion of his own children who, according to the finding of the Chancellor with which we agree, had shown normal affection and attention to him throughout the years.

That this transfer of his home place to Mrs. Pemberton was a gift is not to be disputed. As is said in 12 R.C.L. page 923, (Gifts);

"A gift has been judicially defined as a voluntary transfer of property by one to another, without any consideration or compensation therefor."

This being true, the question of a lack of a valuable consideration as charged by complainant, is not a determinative issue in the cause.

After the proof was practically all in, counsel for complainant asked leave of the Court to amend his bill so as to charge that the complainant was of unsound mind at the time he transferred this property to the defendant, and for leave to have him examined by a doctor, and to suspend the proceedings until the report as to his sanity was in. The request was refused and we are inclined to the view that it was not error for the Chancellor to so hold since such matter was largely discretionary with him and he was of opinion from observing the complainant in Court that it was not a proper case for such action.

Counsel for complainant then asked leave of the Court to amend his bill so as to charge that a confidential relation existed between complainant and defendant at the time of the transfer. This application was likewise refused.

If an amendment to the pleadings were necessary in order to permit consideration of evidence on the question of the relation between the parties at the time of the transfer, we think it would have been an abuse of discretion for the Chancellor to deny the application to amend. However, we are fully satisfied that the averments in the bill and answer are such as to make evidence of the question of the relationship existing between them at the time of the transfer admissible and pertinent. We are further of opinion that, from the averments of the bill and the

admissions and averments in the answer, together with the proof introduced, it is clear that a confidential relationship did exist between Mr. Massey and defendant at the time of this transaction and that such a relationship had existed for a number of years prior thereto.

It is shown, as hereinabove pointed out, that Mrs. Pemberton, as a sister and sister-in-law, had been very attentive to the complainant and his wife and that the relationship between them was close. It is further shown that Mrs. Pemberton looked after the affairs of the complainant and his wife by taking their Social Security checks and paying on the mortgage indebtedness, paying their bills, bringing them food and otherwise dealing with them in matters that were highly confidential. For example, on cross-examination, Mrs. Pemberton testified that she had in her possession all the receipts evidencing the payments on the place of her brother-in-law and sister during their eight years of marriage, and she further testified that she got all the records that her sister had in the house after her sister's death. She said that she went into the cedar chest and took all the records with Mr. Massey's help and that Mr. Massey gave her the key and told her that he wanted her to take the records and take care of them.

Thus, the assignment of error as to the refusal of the Chancellor to allow the amendment to the bill so as to charge a confidential relationship is overruled as being immaterial, but we find that a confidential relationship is shown to have existed at the time of the transfer.

A statement of the general rule applicable to gifts such as this is set forth in 12 R.C.L., page 953, (Gifts) as follows;

"A gift between persons occupying confidential relations toward each other is, if its validity is attacked, always jealously scrutinized by a court of equity, and unless found to have been made freely, voluntarily, and with a full understanding of the facts, will be invalidated. The existence of confidential or fiduciary relations imposes upon the recipient of a gift the onus of establishing its absolute fairness."

Again it is said (page 972),

"Where a confidential relation existed between the donor and the donee at the time of the gift, it is generally considered to be presumptively void, and the burden of proof is on the donee to show the absolute fairness and validity of the gift, and that it is free from the taint of undue influence, and this rule is the same at law as in equity."

In 38 C.J.S. Gifts sec. 34 pages 814 and 815, it is said that where the subordinate of two persons, between whom there was a relation of trust and confidence, made a gift to the dominant one of the two, the gift is voidable, in the absence of equitable defenses, at the instance of the donor, or those who stand in his stead, if the transaction was not thoroughly understood by the donor.

In the text is is also pointed out that in certain jurisdictions, regardless of fraud or actual undue influence, whenever a relation of trust and confidence exists in which the donee is dominant, a gift of the whole of the donor's estate, or the bulk of it, if the gift results in the donor's impoverishment, will not be sustained unless the donor had competent and independent advice. And it is said that under such a rule, if a gift is made by an aged or infirm person acting without independent advice to a

donee in a position to exercise influence over him, an improvident gift which leaves the donor to the mercy of others for his support, or which fails to incorporate an agreement reserving the right to support during the life of the donor which was a part of the transaction, will not be upheld.

In McNeil v. Dobson-Bainbridge Co., 184 Tenn. 99, page 111, 195 S.W.(2d) 626, page 631, it was said;

" 'The jurisdiction exercised by courts of equity over the dealings of persons standing in certain fiduciary relations has always been regarded as one of a most salutary description. The principles applicable to the more familiar relations of this character have been long settled by many well-known decisions, but the courts have always been careful not to fetter this useful jurisdiction by defining the exact limits of its exercise.' Crossman v. Keister, 223 Ill. 69, 79 N.E. 58, 62, 8 L.R.A.,N.S., 698, 706, 114 Am.St. Rep. 305."

In Turner v. Leathers, 191 Tenn. 292, 232 S.W.(2d) 269, in an opinion by the late Mr. Justice Prewitt, the Court held that whenever two persons stand in such relation that one person places confidence and trust in the other who can exert his influence, and this confidence is abused or influence is exerted to obtain an advantage at expense of the confiding party, the person so availing himself of his position will not be permitted to retain the advantage, although the transaction would have been valid in the absence of such confidential relation.

It was further said in that case that, where a ninety year old donor was feeble and required constant attention by a nephew and his wife with whom he lived and where the nephew transacted most of the donor's business, a

confidential relationship existed and gifts of realty and personalty to the nephew and his wife made within two months before his death were invalid in the absence of proof that the donor had competent, independent advice.

In this connection the Court said, (page 297, 232 S.W. (2d) page 271)

"The rule of independent advice means that the adviser must not only be competent but independent.

" 'Proper independent advice in this connection means that the donor had the (preliminary) benefit of conferring fully and privately upon the subject of his intended gift with a person who was not only competent to inform him correctly as to its legal effect, but who was furthermore so disassociated from the interests of the donee as to be in a position to advise with the donor impartially and *confidently* (sic) as to the consequences to himself of his proposed benefactions.' Post v. Hagan, 71 N.J.Eq. 234, 243, 65 A. 1026, 1027, 124 Am.St.Rep. 997; Slack v. Rees, 66 N.J.Eq. 447, 59 A: 466, 69 L.R.A., 393; Roberts v. Chase, 25 Tenn.App. 636, 166 S.W.(2d) 641; Peyton v. William C. Peyton Corp., 23 Del.Ch. 321, 7 A.2d 737, 123 A.L.R. 1482."

One of the strongest statements to be found in the decisions of the Appellate Courts of Tennessee with regard to the principle here involved is set forth in Miller et al. v. Proctor, 24 Tenn.App. 439, 145 S.W.(2d) 809, in an opinion by Judge Felts. In this case it is said that the existence of a relation of special trust and confidence between two persons does not prevent the one who is dependent upon the other from giving him property but *such a relation raises a presumption of invalidity of such a gift and the burden is upon the donee to show by the*

*clearest and most satisfactory evidence that at the time the transaction took place, no advantage whatever was taken.* (page 446, 145 S.W.(2d) 807)

The Court further held that in a suit by a donor's heirs to vacate a deed by the donor to her nurse, where there was a relation of special trust and confidence between the donor and the nurse, the Court of equity could not allow the deed of gift to stand in the absence of a showing that the nurse did not abuse the confidence and trust reposed in her and that the donor acted freely of her own consent and upon independent and disinterested advice.

In the course of the opinion the Court stated as follows;

"It is held in many jurisdictions that where a confidential relationship exists the donee must show not only that no undue influence was used and the gift was understandingly and voluntarily made by the donor, but also that he had the benefit of competent and independent advice of a disinterested third party. See cases cited in annotations, 16 L.R.A.,N.S., 1088, 15 Ann.Cas. 1033; 24 Am.Jur. 757.

"We think the rule announced by the foregoing authorities is applicable not only where the donor himself seeks to impeach the gift but also where his heirs or distributees seek to do so."

The Chancellor in discussing complainant's testimony and pointing up a discrepancy therein, at one point, had this to say;

"He stated he did not recall a visit to the office of Attorney-General Harry Nichol with his sister-in-law. Yet, he tripped on cross-examination when he stated General Nichol was talking to his sister-in-law. (I do not have the record so cannot give the exact quote.)"

As we read the testimony, we do not find that this is particularly significant since complainant went on to testify, after having said that General Nichol did not say anything to him but talked to Mrs. Pemberton, when the question was asked;

"Then you do remember going up to see him?

A. No.

Q. You said he talked to Mrs. Pemberton?

A. Well, that is what Mrs. Pemberton told me."

So that his statement to the effect that he did not remember the transaction was reasonably consistent, although the question as to why he made the transfer and as to what was in his mind if he did know what he was doing, are questions left without any reasonable answer or explanation in this record. This is true, not only from what complainant says, but from what the defendant Mrs. Pemberton says, because she offers no rational explanation or reason as to why this man would denude himself of all his property in her favor as against his children and grand children, and leave himself an object of charity without any promise on her part to look after him or to attend to his wants, or to furnish him a home or any other reasonable consideration.

On the whole, we are satisfied that equity should intervene and set aside this conveyance so that this elderly man will not be left a charge upon the public or his family, penniless and without a home in his declining years. This is true also in view of the further fact that by putting the parties back in statu quo defendant will not have suffered any loss or disadvantage as against the position she occupied before the transfer.

It results that the first assignment is sustained, the judgment of the Chancellor is reversed and the deed from complainant to defendant set aside as being void.

In view of the circumstances shown by the record, complainant will pay the costs, for which execution may issue.

Reversed.

Humphreys and Chattin, JJ., concur.