TOLBERT LANIUS et ux.

*v.*

COMER DONNELL, Administrator, et al.

432 S.W.2d 659.

(*Nashville,* December Term, 1968.)

Opinion filed July 12, 1968.

Petition for Rehearing Denied October 25, 1968.

MacFarland & Reed, Lebanon, for petitioners, Donnell, and others.

A. B. McNabb and E. R. Woolard, Lebanon, for respondents, Lanius and wife.

PER CURIAM.

Donnell and others brought this suit against Lanius and his wife to set aside a deed and declare void the transfer of certain certificates of deposit which were executed by Mrs. Etta Vick to Lanius. The Chancellor heard the case on oral testimony by written agreement under Chancery Rules and decided that:

"The complainants have established by clear and convincing proof that from the latter part of 1963 until her death Mrs. Vick did not possess the mental capacity to make the transfers of her property.

"Question No. 2 must be answered in the affirmative. There is no doubt but what a confidential relationship existed between Mrs. Vick and the defendant, Tolbert Lanius, from November 1963 until the date of her death."

The Court of Appeals reversed holding that the evidence preponderates against the finding of the Chancellor. Thus it is, with these two courts having differed in their findings and conclusions of fact upon oral evidence, we are obligated to review the evidence *de novo* but with

the presumption that the trial court's decision was correct unless the evidence preponderates against it. T.C.A. sec. 27-303. Literally hundreds of cases may be found in the annotation to this Code Section in which various things have been said about its application, but there is no question but that it was the duty of the Court of Appeals to begin its examination of this case with the idea in mind and the presumption that the Chancellor was correct in his decree unless the evidence preponderated against such a finding. We, after carefully reading this record, are convinced that the evidence does not so preponderate. On this question of the preponderance of the evidence for the rule to be applied in civil cases see Wigmore on Evidence, Vol. 9, 3rd Ed., and particularly sec. 2498.

We must keep in mind that the Chancellor has seen and heard all these witnesses on both sides and after seeing and hearing them has determined these issues in favor of the petitioners here and against the defendants. By this finding he has established the credibility of these witnesses. We, especially any of us who has sat on a trial court and seen and heard witnesses testify, must not, and cannot, refute the proposition that the seer and hearer of these witnesses is in a far better position to determine the amount of weight to be given their testimony and the credibility of such witnesses.

For instance, here the defendant, Tolbert Lanius, in answering the majority of questions herein answers them very frankly but none of these answers in the slightest degree injure him. He makes such a beautiful thing out of his attending this old woman for forty-five years, from the time he was a child on up until her death, and yet when he is cross-examined about a mortgage he made

on his property a few months before he denied ever having made a mortgage and finally does say after being repeatedly asked about it that it escaped his mind. As another illustration of what the Chancellor sees, knows and hears when the witness is before him, this same witness says that this old lady, eighty years old, just out of the clear sky told him that she wanted to pay off a mortgage on his, Lanius's, home, amounting to $4,000.00 more or less, and thus at her suggestion he took her down to the bank and she wrote a check for so many thousand dollars and odd cents to pay off this mortgage. Of course, there is no testimony, and there cannot be, under the circumstances as shown by reading the opinion of the Chancellor hereinafter to be quoted in his opinion, about what he did or did not do, but a lot of things must be inferred from what naturally and reasonably happened under such circumstances.

We think that the Court of Appeals disagreed with the Chancellor and went off on the wrong end of this lawsuit when they, as shown in the early part of their opinion, were largely basing it on what the witnesses that they adopt say as to what actually happened at the time this deed was made and at the time these certificates were transferred. As the Chancellor said these witnesses that saw this and heard this did not have an opportunity to go into the matter and did not go into the matter fully.

We granted certiorari, have heard argument and carefully considered the very comprehensive briefs and supplemental briefs filed by both parties. No question of fact or law which was not presented to the Chancellor is presented to us, and we believe that the memorandum opinion filed herein by the Chancellor fully covers all questions presented and correctly decides the case. To

re-write the opinion on the same assignments would serve no useful purpose and we, therefore, adopt the opinion of the Chancellor as the opinion of this Court. *Boillin-Harrison Co. v. Lewis & Co.*, 182 Tenn. 342, 345, 187 S.W.2d 17.

We might say, in addition to what the Chancellor has said, what this Court said in *Turner v. Leathers*, 191 Tenn. 292, 232 S.W.2d 269, as follows:

"It may be that the mentality of Mr. Leathers did not actually fall below the line defining the limits of legal mentality; that he still had mind enough to know what he was doing, or what he intended to do. It is not a question of whether he knew what he intended to do, but how this intention was produced whether it was by abuse of a confidential and fiduciary relation."

It is argued here on behalf of the respondents, defendants below, that the question of independent advice and confidential relationship between these parties cannot be established herein because it was not plead and proved. The bill does not in so many words say that there was no independent advice or anything of the kind but under the allegations of the bill as a whole unquestionably this is alleged. In making this contention the defendants rely upon *Peoples Bank v. Baxter*, 41 Tenn.App. 710, 298 S.W. 2d 732. We think unquestionably under the allegations of this bill that such is charged to such an extent when in the answer in two places these parties take the position with respect to the bank account that it was done following "consultation and advise received by her from disinterested persons". Clearly, under such a situation the confidential relationship is proven and we are satisfied it was, therefore it may be shown and held under the pleadings herein.

The Chancellor's opinion is as follows:

"This is a suit by Comer Donnell, Admr. C.T.A. of the estate of Mrs. Etta Vick, deceased, and Mrs. Naomi Vick Davis, the sole beneficiary under the Will of Mrs. Etta Vick, against the Defendants, Tolbert Lanius and wife, Ruby Lanius, to set aside a deed and certain transfers of certificates of deposit executed by the said Mrs. Etta Vick to the Defendants on the 27th day of January 1964.

"With reference to these transactions, which the purpose of the bill is to set aside, the original bill alleges:

" 'That the said Mrs. Etta Vick was approximately eighty (80) years old at the time of her death and that early in the year 1963, she began to fail in health, and became sick both in mind and in body; that she rapidly became senile and by the middle of the year 1963 frequently did not know or recognize her immediate neighbors; that she had diabetes and a heart condition; that her physical condition and mental condition became steadily worse and she was confined in the hospital in Lebanon for about two (2) weeks and that her physical condition weakened and she rapidly became a person of unsound mind and not able to take care of and manage her money and property.

" 'That the defendant, Tolbert Lanius, began visiting Mrs. Etta Vick toward the middle of the year 1963 and that his visits became more and more frequent; Complainants charge that he flattered Mrs. Vick and talked "baby talk" to her, and so by subtlety and craft gained complete ascendancy over the weak and failing mind and will of the said Mrs. Etta Vick, so that he had her completely under his control; that he came to her resi-

dence many, many times and talked with her and poisoned her mind against complainant, Mrs. Naomi Vick Davis, and counselled her to write this complainant never to set foot in her home again. Complainants charge that while the complainant, Naomi Vick Davis, knew that something was wrong she did not know of the craft and guile of the defendant, Tolbert Lanius, or that he was succeeding in turning the said Mrs. Etta Vick against.'

"The bill further alleges:

" 'Complainants charge that Mrs. Etta Vick withdrew large sums of money from her said savings account in the year 1963 and 64 and turned the said money over to the defendant, Tolbert Lanius; complainants do not know the exact amount of the sums so checked out and received by the defendant, Tolbert Lanius, but complainants charge that the defendant, Tolbert Lanius, received these sums of money while Mrs. Etta Vick was of unsound mind and solely subject to the will and completely in the control of the defendant, Tolbert Lanius, and that the defendant should be required to account for and restore the said sums.'

"The Defendants filed a detailed answer in which all of the material allegations in the bill were denied, and they specifically denied that Mrs. Etta Vick was mentally incapable of executing the deed and transferring the certificates of deposit and they specifically denied that any undue influence was exerted over the acts of the said Mrs. Etta Vick and averred that said acts were of her own free will and that she at all times knew what she was doing and why she was doing so. The Defendants also filed an amended answer and cross-bill wherein they seek to recover for services rendered, if the transfers should

be held invalid. The cross-bill makes the following allegations:

" 'These cross-complainants at this point would again repeat their insistence that the said Mrs. Etta Vick was of sound mind at the time of her death, and at all times preceding her death, including particularly at the time she made the conveyances to these defendants of her real and personal property. However, even if the Court should find that the said Mrs. Etta Vick was of unsound mind, or even if the Court should find for any reason that these defendants do not have title to either the real estate or the personal property of the said Mrs. Etta Vick, including especially the property involved in this suit, then they are entitled to recover of her estate and from the complainant (cross-defendant) administrator, the reasonable fair value of the services rendered by them to the said Mrs. Etta Vick.

" 'Defendants are advised and here recognize the fact that they can legally file claim for no more than six years services immediately preceding the death of the said Mrs. Etta Vick. They repeat their previous averments that they have rendered services to Mrs. Vick over a period of many years, and they say that the services rendered by them over the years actually amount to far more than the total value of her estate. It is here averred that Mrs. Etta Vick recognized this rightful claim on the part of these cross-complainants, and that it was in recognition of the same, as well as by way of appreciation and affection, that she transferred to these cross-complainants all of her property prior to her death.'

"The cause was heard upon oral testimony by written agreement under Chancery Rules, and briefs and argu-

ments have been filed, and the cause is now ready for final disposition.

"The facts of the case are substantially as follows:

"Mrs. Etta Vick, was the widow of E. L. Vick, and she and her husband had for a number of years prior to 1947 operated the Wilson County Poor Farm, and said farm was sold by the county in that year and Mr. and Mrs. Vick moved to Lebanon and a number of former inmates of the Poor Farm were kept by them until the death of Mr. E. L. Vick in 1950, and by Mrs. Vick until her death on October 17, 1964.

"Mr. and Mrs. E. L. Vick had an adopted son, Calvin C. Vick, and while a member of the U.S. Armed Forces this son married the complainant, Mrs. Naomi Vick, now Davis, and they lived together until the said Calvin Coolege Vick was killed in action in Korea in September 24, 1950. The proof is clear that there was a strong love and mutual affection between Mrs. Vick and her daughter-in-law and that they wrote each other weekly up and until November 1963, when for some reason which the record does not show, Mrs. Vick turned against her daughter-in-law. The Defendants in their answer make the following statement:

" 'These defendants do not know of their own knowledge just how close had been the relationship between Mrs. Etta Vick and the said Naomi Vick Davis, but they do know they had been on friendly terms, and that the relationship between them was apparently good until the later years of Mrs. Vick's life, *following the remarriage of the said Naomi Vick to Charles C. Davis. They aver the relationship after that time was not as cordial as it had been prior thereto.*' (emphasis added.)

"There is no evidence in the record to support this theory, and to the contrary the record shows that Mrs. Davis remained the widow of Calvin C. Vick for ten years, and that before she would consent to marry her present husband she brought him to Lebanon and secured the consent and blessing of Mrs. Vick, and after their marriage they continued to visit, except for the period that Mr. and Mrs. Davis were in Germany, Mr. Davis being a member of the Armed Forces up and until April 1963 which was the last visit that both of them made. However, in August 1963 Mrs. Davis visited Mrs. Vick and Mr. Davis did not accompany her as he was away on maneuvers. During the time that Sgt. and Mrs. Davis were in Germany Mrs. Vick wrote them in envelopes that Mrs. Davis had addressed for her, and this continued after their return to the states, up and until November of 1963, as has been heretofore referred to. Mr. and Mrs. Davis have a little girl and in all of the letters Mrs. Vick referred to her as 'little sweety' thus showing that the bonds between these people were very close. All of the letters are of the same tone and character, and as an example of those close ties, I quote from the letter of October 18, 1963 as follows:

" 'Oct. 18, 1963

" 'My Dear sweet Nell and little sweety got your letter today so glad to hear from you all so glad you all are doing all right we are all doing very well you said you wanted me and Birtie to come and stay with you I appreciate your kindness very much but I have been here so long I wouldn't be satisfied no where else and I would hate to leave my good neighbors and friends they are all so nice and good to us Mrs. Squalls sent me a big bowl of soup this morning and it was good

Tolbert came and brought Dear Timie and his wife to see us yesterday they didn't stay very long had to go somewhere else so by now and kiss little sweety for me and answer soon so by now With all my (Love) Mom.'

"The Defendants in their answer state that Mrs. Vick some eighteen months prior to her death had been informed that Mrs. Davis 'had threatened or stated or expressed the desire to place Mrs. Vick in a rest home, and to "take charge" of Mrs. Vick's business and property. This was deeply resented by the said Mrs. Vick, and resulted in the writing of a severe letter by her to the said Mrs. Naomi Vick Davis, this being the letter that is referred to by complainants in their bill.'

"There is no proof to support this allegation.

"After the letter of November 2, 1963 Mrs. Davis called Mrs. Vick and she did not find out what the trouble was. In this connection it should be observed that the letter does not state what the trouble was, and in fact is conflicting and confusing. She started the letter out as usual by saying 'Dear Nell and little sweety' and then stated: (sic) 'We are all doing very well so let all our troubles go I know it is true so a nice honest person told me all about it so don't worry because everything will be all right and dont come to straighten it up because everything is all right now so ans soon by now with all my

'Mom. (Love)'

"After receiving this letter Mrs. Davis called Mrs. Vick, and then wrote Judge Turner Evans, County Judge of Wilson County. The introduction of this letter is objected to, and the objections are overruled, because it is a circumstance which shows the concern that Mrs.

Davis had about the condition of Mrs. Vick, and rebuts the allegation that Mrs. Davis was trying to take over. Likewise Judge Evans' reply shows that his opinion of Mrs. Vick's condition was the same on December 2, 1963 as it was when he testified. Mrs. Davis also wrote the Defendant, Mrs. Ruby Lanius, inquiring about Mrs. Vick and in an effort to ascertain what had prompted Mrs. Vick to write the letter of November 2nd. Mrs. Lanius' reply sheds as much light, if not more, about the events that were taking place at that time. In that letter Mrs. Lanius wrote:

" 'I don't know what happened or who told her what she hasn't mentioned it to me in any way just what she told Tolbert is all we know about it, she had already told or wrote to you before she told him & she tells him when she hears from you & that she didn't want you and Dave up here any more I wonder some times if some one did tell her that or if something snaped in her mind and she just got it in her mind. I have always been told anyone that was not themselves they would turn against those they seemed to think the most of. Tolbert said every time she told him anything about you she waited until Birdie was out of the room so I don't know if she knows much about it. One day she went to town she didn't talk right to Birdie she got worried about her and she got Mrs. Quarlls to call Tolbert he went down there & found her & carried her home & got her to lay down a while said she was give out. He never told her they called him. he never says anything to her that he thinks mite get her upset. so I don't know Nell if maybe it wouldn't be better if you didn't come right now give her a little more time maybe she will snap out of it. My boys went

to see her & she didn't know them Ben Wright went & she didn't know him she acted a little strange when Manny & Pa went. You know she was always so close to them.

" 'Birdie says she gets mad at her she want let her do the thing she starts to do whatever it might be at the time said she just left her alone & after a while she would be alrite. so I don't know how it will turn out this is all I know to tell you.' These statements are in conflict with the direct testimony of Mrs. Lanius at the trial of this cause.

"Following these events on January 27, 1964 Mrs. Vick and the Defendant, Tolbert Lanius, went to the Court House and asked the Register who they could get to write a deed and Hon. Glen Bishop was in the office and Mr. Spickard referred them to Mr. Bishop and they went to the office of Mr. Bishop and he wrote and acknowledged the deed. They then left the Court House and went to the Lebanon Bank where the checking and savings account of Mrs. Vick were transferred to 'Mrs. Etta Vick or Tolbert Lanius, payable to either or the survivor.'

"On September 10, 1964, twelve days before Mrs. Vick's death she gave the defendant, Tolbert Lanius a check for $4,856.07 which he used to pay off a mortgage against his home. Mrs. Vick died October 17, 1964 and five days later the defendant transferred all remaining funds to the joint account of 'Tolbert Lanius and wife, Ruby Lanius.'

"Based upon these facts, there are three questions to be determined as follows:

'First: At the time these transfers were made, was Mrs. Etta Vick of sound mind and did she have sufficient mental capacity to know the extent and value of her estate so as to be fully aware of what she was doing?

"Second: Did there exist a confidential and fiduciary relation between Mrs. Vick and the Defendant, Tolbert Lanius at the time of the transfer?

"Third: If such a relation did exist, did Mrs. Vick have the preliminary benefit of independent competent advice?

█ "On the first question as to Mrs. Vick's mental capacity, a number of witnesses testified both as to her soundness of mind and her unsoundness of mind. On the question of the lay testimony, the rule by which such evidence is weighed is stated briefly in *Melody v. Hamblin,* 21 Tenn.App. 687, 115 S.W.(2d) 237 as follows: 'While non professional or lay witnesses, after stating the facts on which their opinions as to the testator's sanity or insanity are founded, are allowed to give such opinions in evidence, the opinions themselves, apart from the facts and circumstances on which they are based, are not evidence. * * *'

"This was a will contest and in that case the Court also said:

" 'Mere physical weakness, or disease, old age, eccentricities, blunted perception, weakening judgment, failing mind or memory, are not necessarily inconsistent with testamentary capacity, but are facts to be considered in determining whether such capacity existed. One may be capable of making a will and yet incapable of making a contract. Sizer's Pritchard on Wills, 100, and cases there cited. *Capacity to acquire*

*and preserve property is evidence of testamentary ca-
pacity, but not conclusive. Gass' Heirs v. Gass' Ex'rs,
3 Humph. 278, 22 Tenn. 278, 285.*

"When all of the facts and circumstances testified to by
the witnesses are considered, I think complainants have
established by clear and convincing proof that when
these transfers were made Mrs. Vick did not possess
sufficient mental capacity to know the effect of same. To
review the testimony of each of the witnesses would entail
far too lengthy an opinion, and it is only necessary to
state that Judge Turner Evans, his secretary and Dr.
J. W. Lawrence, because of the nature of the associations
they had with Mrs. Vick, were in a better position to
observe her actions than were the witnesses who testified
as to her soundness of mind. Several of the witnesses
for the defendants did not detail the conversations and
from their testimony their opportunities for observing
her actions were limited. As heretofore stated, there is
no evidence establishing a reason for Mrs. Vicks' sudden
turning against her daughter-in-law, and since the de-
fendants both testified that they did not poison her mind
I can only conclude that she imagined that something
had happened. Also the letter itself shows to my satis-
faction that at that time Mrs. Vick's mind was not clear.
It is understandable that when Mrs. Davis received this
letter she was upset, and her actions in an effort to find
out what had happened were natural. Mrs. Lanius' letters
to Mrs. Davis show how she viewed Mrs. Vick's mental
condition at that time.

"Objections were made to the testimony of Dr.
J. W. Lawrence, a licensed chiropractor, and I am sus-
taining the objection in so far as it relates to Dr. Law-
rence as an expert on mental illness, for I do not consider

that he was testifying as such, his opinion was based upon his knowledge of Mrs. Vick's physical condition and his personal observation of her and numerous conversations which he had with her. Under the Healing Acts Statutes of Tennessee he was a competent witness to state the nature of her illness. He and Judge Turner Evans were in a better position to observe her and the reasons which they gave for their opinions are entitled to more weight than the witnesses who testified for the defendants. Mr. Glen Bishop did not know Mrs. Vick prior to the occasion when he wrote the deed. From this one meeting he did not notice anything to indicate that she was of unsound mind, and the defendant, Tolbert Lanius, was with her. It was insisted by defendants that the testimony of Mr. Bishop, Mr. Spickard, and Mrs. Virgil Riggan, who saw her briefly on the day the transfers were made, because they did not observe anything in her actions to indicate mental incapacity that on that date she was experiencing a lucid interval, even though at other times she may have been incapacitated. I have carefully reviewed the testimony of these witnesses and I do not believe that their testimony supports this view.

"In *Melody v. Hamblin*, supra, the Court said:

" 'The fact that the attesting witnesses failed to observe anything in the manner or conversation of Mrs. Hamblin to indicate that she was of unsound mind does not necessarily establish that this was a lucid interval, or that she was not under the influence and effect of delusions. Although she appeared to be perfectly sane and rational at the time of the execution of the will, so as to convince the attesting witnesses that she was sane, "the jury could conclude reasonably from all the testimony, that there was back of all of it an insane

condition leading her to make such a will." *Bridges v. Agee,* 15 Tenn.App. 351, 368. A lucid interval is not merely a cooler moment, an abandonment of pain or violence or of a higher state of torture, a mind relieved from excessive pressure, but an interval in which the mind, having thrown off the disease, has recovered from its general habit. A lucid interval is not the mere absence of the subject of the delusion from the mind. By a lucid interval is not meant a concealment of delusions, but their total absence, their nonexistence in all circumstances, and a recovery from the disease and subsequent relapse. *Attorney General v. Parnther,* 3 Bro.C.C.(Belt) 444; *Waring v. Waring,* 6 Mo.P.C. 354; 12 Jur. 947, 948, 952; *Banks v. Goodfellow,* L.R. 5 Q.B. 549; also reported in 8 Am.Rep. 185-195.'

■ "The complainants have established by clear and convincing proof that from the latter part of 1963 until her death Mrs. Vick did not possess the mental capacity to make the transfers of her property.

■ "Question No. 2 must be answered in the affirmative. There is no doubt but what a confidential relationship existed between Mrs. Vick and the defendant, Tolbert Lanius, from November 1963 until the date of her death.

"In discussing what constitutes a confidential relationship the Court of Appeals of Tennessee, Middle section, in *Roberts v. Chase,* 25 Tenn.App. 636, 166 S.W. (2d) 641, stated:

" 'The fiduciary relation may be of any kind which implies confidence, as trustee and beneficiary, attorney and client, parent and child, guardian and ward, physician and patient, nurse and invalid, *confidential friend and adviser, indeed any relation of confidence*

*between persons which gives one dominion or influence
over the other. Bayliss v. Williams,* supra, [46 Tenn.
440] *Miller v. Proctor,* supra, [24 Tenn.App. 439, 145
S.W.2d 807]. Speaking of a transaction between parties
to a fiduciary relation Mr. Pomeroy says: "While
equity does not deny the possibility of valid transac-
tions between the two parties, yet because every fi-
duciary relation implies a condition of superiority held
by one of the parties over the other, in every transac-
tion between them by which the superior party obtains
a possible benefit, equity raises a presumption against
its validity; and casts upon that party the burden of
proving affirmatively its compliance with equitable
requisites, and of thereby overcoming the presump-
tion." Vol. 3, p. 790.

" 'The presumption of invalidity extends to all deal-
ings between persons in fiduciary and confidential
relations, and embraces gifts, contracts, sales, releases,
mortgages and other transactions by which the domi-
nant party obtains a benefit from the other party.
Trusts and Trustees, by Bogert, vol. 3, 493, p. 1566.
The strength of the presumption varies according to
the circumstances of each particular case. (emphasis
added.)'

"Beginning in November of 1963 the defendant, Tol-
bert Lanius, began to go with Mrs. Vick to the office of the
County Judge, to transact her business for her, and one
has only to read the letters from Mrs. Lanius to Mrs.
Davis to see how completely he had the confidence of
Mrs. Vick and the influence which he exerted over her.
When this association began there was a complete re-
versal of Mrs. Vick's attitude toward her daughter-in-law
and toward others in whom she had previously confided.

"On December 16, 1963 Mrs. Lanius wrote Mrs. Davis as follows:

" 'About cousin Etta she is not improving any some day she seems to be doing very well then maybe the next day she has to lie down 2 or 3 times *Tolbert goes to see about her almost every day* some days he doesn't have the car. I go as often as I can. I talk to her once in a while but when she calls me *(if she wants Tolbert for any-thing) she talks like I am a stranger."* (emphasis added.)

"On March 17, 1964, she wrote:

" 'Tolbert keeps a close watch on her he goes every day sometimes twice she has gotten if he doesn't go or is late getting there she calls she is afraid he is sick'.

"On May 29, 1964 she wrote:

" '*Tolbert sees after everything for her* he goes every day to see about her if she is not feeling so well he goes back before night don't think he doesn't look after her because he does. About the house she told Tolbert Sun. after noon 31st. Monday morning Jan. 27 that she wanted him to take her to the courthouse when they came back from seeing the Dr. that she wanted him to have her house at her death and she wanted to deed it to him now while she was able to *that she didn't know what she would do without him that he was the only one she had to depend on.'* (emphasis added.)

"It is interesting to note that no mention of the trans-fers of the certificates of deposit was made.

"From the evidence as a whole, there can be no ques-tion but what a confidential relationship existed and that the defendant, Tolbert Lanius, was the dominant party.

"The next and final question is, did Mrs. Vick have the benefit of independent advice?

"In *Turner v. Leathers,* 191 Tenn. 292, 232 S.W.(2d) 269 the rule of independent advice was stated as follows:

" 'Proper independent advice in this connection means that the donor had the (preliminary) benefit of conferring fully and privately upon the subject of his intended gift with a person who was not only competent to inform him correctly as to its legal effect, but who was furthermore so disassociated from the interests of the donee as to be in a position to advise the donor impartially and confidently as to the consequences to himself of his proposed benefactions. *Post v. Hagan,* 71 N.J.Eq. 234, 243, 65 A. 1026, 1027, 124 Am.St.Rep. 997; *Slack v. Rees,* 66 N.J.Eq. 447, 59 A. 466, 69 L.R.A. 393; *Roberts v. Chase,* 25 Tenn.App. 636, 166 S.W.2d 641; *Peyton v. William C. Peyton Corp.,* 23 Del.Ch. 321, 7 A.2d 737, 123 A.L.R. 1482.

" 'Whenever two persons stand in such a relation that, while it continues, confidence is necessarily reposed by one, and the influence which naturally grows out of that confidence is possessed by the other, and this confidence is abused, or the influence is exerted to obtain an advantage at the expense of the confiding party, the person so availing himself of his position will not be permitted to retain the advantage, *although the transaction could not have been impeached if no confidential relation had existed.*' Pomeroy's Equity Jurisprudence, 5th Ed., Vol. 3, 956, p. 792.

"It is insisted that Mrs. Vick had the benefit of independent advice from Mr. Bishop and from Mr. Jennings. From the testimony of Mr. Bishop it clearly appears

that she did not seek advice and he did not give her any, other than to explain how the deed should be made. She did not tell him about her intentions to transfer all of her property to the defendant, nor did she tell him that for the transfer the defendant was to look after, support and care for her. The writing of the deed did not meet the requirements of the rule stated above, and Mr. Lanius was present all of the time. Mrs. Vick did not seek the advice of Mr. Jennings when the certificates of deposit were transferred, she only told him, in the presence of the defendant, what she wanted to do.

"In *Massey v. Pemberton,* 54 Tenn.App. 342, 390 S.W. (2d) 709 the Court of Appeals, Middle Section quoted with approval the statement in 12 R.C.L., page 953, (Gifts) as follows:

" 'A gift between persons occupying confidential relations toward each other is, if its validity is attacked, always jealously scrutinized by a court of equity, and unless found to have been made freely, voluntarily, and with a full understanding of the facts, will be invalidated. The existence of confidential or fiduciary relations imposes upon the recipient of a gift the onus of establishing its absolute fairness.'

"Again it is said page (972).

" 'Where a confidential relation existed between the donor and the donee at the time of the gift, it is generally considered to be presumptively void, and the burden of proof is on the donee to show the absolute fairness and validity of the gift, and that it is free from the taint of undue influence, and this rule is the same at law as in equity.'

■ "From the facts in this case I find that Mrs. Vick did not have the benefit of independent advice.

"By the cross-bill the defendants seek to recover for services rendered. In this connection it is only necessary to state that there is no proof of any services rendered prior to November 1963 by the defendants to Mrs. Vick, and that between that date and the date of Mrs. Vicks death the services consisted of the defendant, Tolbert Lanius, going often to see about Mrs. Vick and taking her to town and to the doctor. The record shows that prior to 1963 Mrs. Vick looked after herself, and evidently managed her affairs well in that she was able to save a considerable amount of money, a part of which came from benefits of her deceased son after the remarriage of her son's widow. The cross-bill is dismissed.

HUMPHREYS, JUSTICE, not participating.

On Petition To Rehear

Counsel have filed herein a very dignified and respectful petition to rehear. This petition in every particular presents the identical argument heretofore forcefully made in the respective briefs in this Court and in the oral argument so ably made here. We reached the conclusion that we did as expressed in the original opinion, after very carefully reading this record and considering these briefs and arguments. Since this petition to rehear has been made we have again reviewed what we went over heretofore when we first read this record. We can find absolutely nothing herein that in any way would change our mind.

In *Louisville & N. Railroad Co. v. United States Fidelity & Guaranty Company*, 125 Tenn. 658, 148 S.W. 671,

this Court quoted from Mr. Justice Story to the effect that he was sorry at times to disagree with counsel but sometimes it was necessary when the facts and the law convinced the Court otherwise. We suggest counsel read this case as well as Rule 32 of this Court which cites the case just referred to, that is *Louisville & N. Railroad Co., v. United States Fidelity & Guaranty Co.*, supra, and other text writers on the subject.

This is a most outstanding case from the standpoint of the two lower courts disagreeing on the facts and is a perfect example of the rule to be followed, that is, to remember always that the one seeing witnesses is in a far better position to tell which are detailing the truth than is one who sees merely the record for many reasons which have been cited in cases of this Court in the past. We are sorry to disagree with counsel but are convinced that the Chancellor was correct in his findings herein and we must therefore deny the petition to rehear.

HUMPHREYS, JUSTICE, not participating.