**Winford R. ROBINSON et al.**

v.

**Paul F. ROBINSON et al.**

Court of Appeals of Tennessee, Eastern Section.

May 22, 1974.

Certiorari Denied by Supreme Court Nov. 25, 1974.

Harris, Moon, Bell & McCallie, Chattanooga, for appellants.

Brown & Brown, Chattanooga, for appellees.

## OPINION

SANDERS, Judge.

The Defendants have appealed from a decree of the Chancery Court setting aside a deed to them on the grounds it was obtained through undue influence.

The Plaintiffs, Winford R. Robinson, Mrs. Leonard Lee, Mrs. Martin Allen and Mrs. Clyde Lee, filed suit in the Chancery Court of Hamilton County against the Defendants, Paul F. Robinson and wife, Sarah Lou Robinson, seeking to set aside a deed from Lizzie Robinson to the Defendants.

Lizzie Robinson was the mother of the Plaintiffs and the Defendant, Paul Robinson. Approximately three years before the death of Lizzie Robinson, she executed a deed to the Defendants for the remainder interest in a tract of land in Hamilton County containing approximately 50 acres, retaining to herself a life estate.

The Plaintiffs insist in their complaint that a confidential relationship existed between the Defendants and Lizzie Robinson and the deed was obtained through undue influence.

The Defendants, however, contend that the deed was made to them as a result of an agreement that they would take care of Lizzie Robinson and Charlie Robinson, their father, as long as they lived. The Defendants also insist that two of the Plaintiffs, as well as other brothers and sisters, acquiesced in the agreement.

The case was tried before The Honorable Ray L. Brock, Jr., Chancellor, who found the issues in favor of the Plaintiffs and ordered the deed set aside.

The Defendants have appealed and assigned error.

The proof shows that Lizzie Robinson and Charlie Robinson had nine children, including all of the Plaintiffs and the Defendant, Paul F. Robinson. In the early part of 1967 Lizzie and Charlie Robinson were living in Hamilton County on a small farm near Ooltewah, which they owned as tenants by the entireties. Mr. Charlie Robinson had become very ill. Having had a stroke, he was virtually helpless and had lost control of his bowels and kidneys so that it was necessary for him to be diapered and changed like an infant.

The Defendants owned their home and lived at Hixon, Tennessee, but the Defendant, Paul Robinson, was unemployed.

The mother, Lizzie Robinson, could not care for the father, Charlie Robinson, without help. Realizing the needs of their mother and father, two of the Plaintiffs, Winford Robinson and Mrs. Martin Allen, together with two other sisters, Pauline Lynn and Mary Lou Webb, who are not parties to this litigation, agreed to suggest to the Defendant, Paul Robinson, that if he would agree to sell his home at Hixon and move to the home place of their parents and take care of them for the rest of their lives, he would be given the farm.

The Plaintiffs, Winford Robinson and Pauline Lynn, discussed the matter with

the Defendant, Paul Robinson, after which he discussed the matter with the Defendant, his wife, and she would not agree. However, after discussing it further with the Plaintiff, Winford Robinson, the Defendant, Sarah Robinson, did agree. In her testimony on this point, she said, "Winfred talked to me out in the back yard, and he talked to me about letting Paul sell the place and moving up there, getting a trailer and moving it up there so we would be close up there so we could take care of them, because we were taking care of them anyway. And I thought about it for awhile and I said, 'Winfred,' I said, 'Is this what all of you want?' And he said, 'Yes, this is what we all want,' and I said, 'Well, if this is the way you all want it, I'll let him sell it and we'll move up here with them.' "

Following this agreement, the Defendants sold their home in Hixon in preparation for buying a trailer and moving it to the home of his parents. They did not move from Hixon immediately, but they commuted between their home in Hixon and the parents' home near Ooltewah to care for them. The driving time between the two places was about 30 minutes.

Soon after the agreement was made and after the Defendants had sold their home at Hixon, but before a deed was made to the Defendants for the home place, the father died.

It would appear from the record and the subsequent events that the Plaintiffs felt that the father, who was the real burden of care, had lived such a short time that the Defendants did not deserve the farm and objected to its being given to them.

Although the relationship between the brothers and sisters had been friendly and cordial prior to the death of their father, immediately after his death animosity and hard feelings developed by the Plaintiffs toward the Defendants. The Plaintiffs, Winford Robinson and Mrs. Allen, also developed such hard feelings toward their mother that they quit visiting her and wouldn't even speak to her.

The proof shows that on the day of the father's funeral the Plaintiff, Winford Robinson, tried to persuade his mother not to deed the farm to the Defendants. He testified as follows:

"Q Had your mother ever said anything to you about giving this to Paul?

"A I don't know whether—I'd discussed it with her. After we came back from Daddy's funeral, at the kitchen table, I told her not to give it to Paul, there was eight more people in the family that deserved it more than Paul did, or as much."

The record fails to show what Mrs. Robinson's response was to this conversation.

The proof shows, however, that even though the Plaintiff, Winford Robinson, lived on property adjacent to that of his mother and only a few hundred feet away, he never visited his mother again and didn't even speak to her during the remainder of her lifetime.

It appears from the record that at the time of the death of the father, the mother and at least part of the brothers and sisters were under the impression that any deed to the Defendants would have to be signed by the brothers and sisters.

Pauline Lynn, one of the sisters, testifying in behalf of the Defendants, said:

"Q All right. Now, after your father died was there any change in having such a deed prepared?

"A Well, I talked to my mother after Daddy died and she said, 'Well, Pauline, just go ahead and finish this up while the other two children are home from Ohio.' My two sisters were in from Ohio. She said, 'If there's any papers that have to be signed, we'll get it all signed and fixed while they're here.' So I went down and talked to Winfred again.

"Q  Uh-huh.

"A  And he was in his trailer and I went in the house, trailer, and he got real smart and he followed me back out to the car, just myself.  He followed me back out to the car and I had to drive off with him talking smart and holding onto my car, and I left, and I went back and talked to my mother and she said, 'If there's any way that it can be fixed, we'll go ahead and fix it.' "

After this occurrence they learned it was not necessary for the brothers and sisters to sign the deed.

Mr. Wendell Kelley, who works for Title Guaranty & Trust Company and who lived near Ooltewah, was consulted about preparing a deed.  Mr. Kelley testified that before being approached about preparing a deed from Mrs. Robinson to the Defendants, he had had a call from the Plaintiff, Mrs. Allen.  As a result of his conversation with Mrs. Allen, he "knew that a lawsuit was brewing."  He said, "So I advised Mr. Robinson and his mother that if they wanted me to notarize that deed that I wanted a letter by a psychiatrist dated on the same date that I notarized the deed as to the mother's competency in order to protect me under my notary bond, and also to show a valid conveyance."

Following this conversation, Mrs. Robinson requested the Defendant, Paul Robinson, to take her to a psychiatrist, but he refused to do so, saying, "I'll take you to a doctor if you need one, but not to a psychiatrist because you don't need it."

Since Paul refused to take her to a psychiatrist, Mrs. Robinson arranged with one of her neighbors to take her.  The deposition of the psychiatrist who examined Mrs. Robinson was taken and he testified that he was aware of the fact that the purpose of her visit was related to property she was going to convey to a member of her family.  In part, he said: "On the basis of my examination, I found Mrs. Robinson to be of sound mind, aware of the nature and extent of her property, and that she knew who the objects were of her bounty, the natural objects of her bounty.  It was my opinion at that time that she was entirely free of any mental disease, defect or derangement which would in any way impair her capacity to negotiate a will or convey any property in her possession."

He also wrote a letter to Mr. Kelley, the notary public, which, in substance, said the same thing.  The letter was delivered to Mr. Kelley and he took Mrs. Robinson's acknowledgment to the deed the same day, June 9, 1972.

Mr. Kelley was asked about his conversation with Mrs. Robinson on this occasion and said:

"A  I had in the two conversations that I had with her that I recall, yes, sir.

"Q  What did she tell you?

"A  Well, again because I had this forewarning of all that might happen, I went over it and asked her if she realized fully what she was doing and if she realized that she was conveying the property to Paul and it was going to wind up being Paul's, and she was fully aware of it, and on these assertions I made my decision to go ahead and notarize the instruments."

Although the notary public requested the letter from a psychiatrist before taking Mrs. Robinson's acknowledgment, no one ever indicated that she was mentally incompetent.  To the contrary, all of the witnesses, including the Plaintiffs, testified that she was mentally alert and knew what she was doing.

One witness who was a sister-in-law to Mrs. Robinson and apparently had no interest in the case, testified for the Defendants.  She testified that she visited Mrs. Robinson frequently, both before and after Mr. Robinson's death.  She testified that Mrs. Robinson told her prior to Mr. Robinson's death about the agreement to convey the farm to the Defendants if they would take care of her and Mr. Robinson as long

as they lived. She further testified that after Mr. Robinson's death she was spending the night with Mrs. Robinson when Mrs. Robinson said to her, " 'Mae,' she said, 'You know what the boys and the girls agreed to do, let Paul have the place if they'd take care of me and Charlie.' Charlie died. Said after he died then they decided they didn't want to do that and she said, 'I just went and made the deeds myself and give it to Paul.' "

This witness had this further comment, "They moved up there and they really took care of Lizzie. I can say that."

The Chancellor filed a memorandum opinion in which he said: "Under the law as discussed and applied in Massey vs. Pemberton, 54 Tenn.App. 342, 390 S.W.2d 709, the Court finds that the defendants occupied a confidential relationship to the grantor and thus have the burden of showing that undue influence did not produce the conveyance. There is no evidence that the grantor had any independent advice to guide her and, on the whole, defendants have failed to carry the burden of showing that this deed to only one of the grantor's nine living children was free of undue influence."

■ We cannot agree with the Chancellor that the case of Massey v. Pemberton, *supra,* is controlling in this case. The Massey case is distinguishable from the case at bar. In the Massey case the court found there was a confidential relationship between the donor and the donee. Although our courts have not defined very clearly the elements which must be present for a confidential relationship to exist, it appears that any relation of confidence between persons which gives one domination over the other falls within the category. Bayliss v. Williams, 46 Tenn. 440; Miller v. Proctor, 24 Tenn.App. 439, 145 S.W.2d 807; Roberts v. Chase, 25 Tenn.App. 636, 166 S.W.2d 641.

In a New Jersey case of Kerlin v. Maher, 139 N.J.Eq. 566, 52 A.2d 767, the court said dominance of the mind rather than physical dominance is required to raise a presumption of undue influence of the grantee on the grantor in case of a conveyance by a parent to a child.

■ In the case at bar we think the record fails to establish a confidential relationship between the Defendants and Lizzie Robinson. There is no proof in the record to suggest that the Defendants did or could have exercised dominion over Lizzie Robinson.

■ Although a fiduciary relation may be any kind which implies confidence, such as parent and child, Bayliss v. Williams, *supra,* the relationship of parent and child does not, per se, create a confidential relationship, although "where a confidential relation exist[s] between the donor and the donee at the time of the gift, it is generally considered to be presumptively void, and the burden of proof is on the donee to show the absolute fairness and validity of the gift, and that it is free from the taint of undue influence . . ." Massey v. Pemberton, *supra.* "The relationship of parent and child does not raise a presumption that a deed from the parent to the child is invalid." 26A C.J.S. Deeds § 193c, Parent and Child.

■ Even if a confidential relationship existed in the case at bar, we think the Defendants have overcome the presumption of invalidity by showing they did not abuse the confidential relationship.

It is not the confidential relationship between the parties that our courts are concerned with, but the abuse of that relationship. This point is made clear in the case of Turner v. Leathers, 191 Tenn. 292, 232 S.W.2d 269, where the court said: "It is not a question of whether he knew what he intended to do, but how this intention was produced, whether it was by abuse of a confidential relationship or a fiduciary relation[ship]."

It was not the idea or suggestion of the Defendants that they would sell their home, buy a trailer, move it to the home of the parents and take care of them for the rest of their lives in exchange for the farm. This was the suggestion of the other brothers and sisters, including two of the Plaintiffs. These brothers and sisters, concerned about the welfare of their parents and doubtless feeling that this was in their best interest, brought this understanding about in good faith on the part of all concerned.

The Chancellor, in his memorandum opinion, pointed out that Mrs. Robinson did not have the benefit of independent advice. While it is a well-established rule in certain cases involving undue influence that the donor must have the benefit of independent advice, we do not think it applies in the case at bar.

In the case of Turner v. Leathers, *supra,* the court said:

"Under the circumstances *presented in this cause,* on account of the age, physical and *mental deterioration* of the donor, and where he is under the *unquestioned 'dominion and control'* of the donee, it is necessary that he have competent, independent advice, free from the influence of the donee, in order for the gift to stand." (Emphasis ours.)

The facts present in the Turner case are not present in this case.

Although the donor was 72 years of age and suffering from high blood pressure and heart ailment, Dr. McCallie testified that she was a normal person for her age. There was no mental deterioration nor was there any dominion or control over her by the donees.

Under the facts and the law applicable to the case, we think the assignments of error are well taken, and they are sustained.

The judgment of the Chancellor is reversed and the complaint is dismissed.

The cost of this appeal, together with the costs of the trial court, are taxed to the Appellees.

COOPER, P. J. (E.S.), and PARROTT, J., concur.